## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NEURELIS INC.                             )<br><br>Plaintiff,             )<br><br>v.                                   )<br><br>ROBERT M. CALIFF, <br>in his official capacity as <br>Commissioner of Food and Drugs, )<br><br>U.S. FOOD AND DRUG <br>ADMINISTRATION, )<br><br>XAVIER BECERRA, <br>in his official capacity as <br>Secretary of Health and Human Services, )<br><br>and                                   )<br><br>U.S. DEPARTMENT OF HEALTH <br>AND HUMAN SERVICES, )<br><br>Defendants. )| Civil Action No. 1:24-cv-1576 |

## COMPLAINT

Neurelis Inc. ("Neurelis" or "Plaintiff"), by its undersigned counsel, hereby files this Complaint against Robert M. Califf, in his official capacity as Commissioner of Food and Drugs (the "Commissioner"), the U.S. Food and Drug Administration (the "FDA"), Xavier Becerra, in his official capacity as Secretary of Health and Human Services (the "Secretary"), and the U.S. Department of Health and Human Services (the "HHS") (together, "Defendants"), and alleges as follows:

## PRELIMINARY STATEMENT

1.    Obtaining approval for a new drug under the Federal Food, Drug, and Cosmetic Act (the "FDCA") is notoriously time-consuming and expensive, typically taking years and costing tens or hundreds of millions of dollars.  Drug development for orphan diseases and conditions—those that affect 200,000 or fewer persons in the United States—can be prohibitively costly and resource-intensive in light of the comparatively small market upon approval.

2.    In an effort to incentivize rare disease drug development, Congress enacted the Orphan Drug Act (ODA) to "reduce the costs of developing" and "provide financial incentives to develop [orphan] drugs."  Pub. L. No. 97-414, § 1, 96 Stat. 2049 (1983).  The most critical incentive is a lengthy period of exclusivity.  21 U.S.C. §§ 360bb-360cc.  When an orphan designated drug is approved, FDA cannot approve another "same drug" for the "same disease or condition" for a period of seven years.  *Id.* § 360cc(a).  There are only two narrow exceptions: FDA may approve another drug during an existing orphan drug exclusivity period only if (1) there is a drug shortage or (2) exclusivity is waived.  *Id.* § 360cc(b).

3.    Relying on these statutory incentives, Neurelis undertook significant financial risk and spent tens of millions of dollars and close to a decade developing VALTOCO® (diazepam nasal spray), a groundbreaking diazepam nasal spray that is orphan designated for management of acute repetitive seizures and FDA approved for treatment of acute repetitive seizures (*i.e.*, seizure clusters) in patients with epilepsy 6 years of age and older.   Until Valtoco was approved in 2020, the only option for these patients was a diazepam rectal gel called Diastat, which had serious drawbacks because of its route of administration.  Valtoco reflected a major improvement in patient care compared to Diastat, based on its ease of administration particularly in the middle of a seizure event.  FDA recognized Valtoco's pioneering contribution and approved and granted

orphan drug exclusivity for Valtoco, confirming that Neurelis was entitled to seven years of orphan drug exclusivity.

4.      Under 21 U.S.C. §§ 360cc(a), Valtoco's orphan drug exclusivity means that FDA "may not approve" the "same drug" (diazepam) "for the same disease or condition" (seizure clusters or acute repetitive seizures) until January 10, 2027, when the 7-year period of exclusivity expires.

5.      Defying Congress's express command, on April 26, 2024, FDA did just that: it approved Aquestive Therapeutics' ("Aquestive's") drug Libervant, a diazepam buccal film, for treatment of seizure clusters in patients with epilepsy aged 2 to 5.  FDA's approval letter offered no explanation or justification.   Ex. A (Approval Letter from FDA to Aquestive (Apr. 26, 2024)). Nor did FDA attempt to reconcile its approval with its prior recognition that, as a result of the "orphan exclusivity granted to . . . Valtoco,"  Libervant "may not be finally approved for marketing" until that exclusivity period "expired."  Ex. B (Tentative Approval Letter from FDA to Aquestive (Aug. 30, 2022)) at 1.

6.      FDA's approval of Libervant was unlawful.  FDA cannot gerrymander its way around the orphan drug exclusivity period by limiting its approval of Libervant to children aged 2 to 5 while Valtoco is approved for children 6 and up.  Seizure clusters is a single "disease or condition" whether in a 5-year-old or a 6-year-old, and FDA may not evade the ODA's express prohibition on approval of the same drug "for the same disease or condition" by invoking a clinically meaningless age-based distinction contrary to the statutory text.

7.      Just two years ago, the Eleventh Circuit explained exactly this, barring FDA from approving a drug for "the same disease or condition" in a pediatric population during an existing period of orphan drug exclusivity awarded based on an approval in the adult population.  *See*

*Catalyst Pharms., Inc. v. Becerra*, 14 F.4th 1299, 1307-12 (11th Cir. 2021).

8.      FDA's age-based distinction would be arbitrary and capricious even if it were not contrary to the statutory text. There is no relevant clinical or other material difference between treatment of seizure clusters in 2 to 5-year-old pediatric patients and treatment of seizure clusters in older pediatric patients and adults. Indeed, the new drug application for Libervant presented only pharmacokinetic data from 6 patients treated with Libervant in the 2 to 5-year-old population. FDA approved Libervant for 2 to 5-year-olds based almost exclusively on clinical data from the exact same adult and older pediatric patient population for which Valtoco is approved.

9.      FDA also disregarded objective evidence showing that Aquestive intended to promote the unapproved use of Libervant in older pediatric and adult patients—which confirms that FDA was attempting to gerrymander its way around the orphan drug exclusivity. FDA cannot approve a drug where an intended use is not included in the approved labeling. 21 U.S.C. § 355(d); 21 C.F.R. § 201.57(c)(15)(i) ("[A]ny clinical study that is discussed in prescription drug labeling . . . must not imply or suggest indications or uses" for which the drug is not approved). But objective evidence showed that Aquestive intended to promote the unapproved use of Libervant to older pediatric and adult patients—a transparent (and improper) effort to circumvent the exclusivity protections granted to Valtoco under the ODA. All but a small fraction of the patients included in the clinical studies discussed in Libervant's approved labeling are older pediatric and adult patients. Libervant's label includes dosing for patients weighing up to 30 kilograms (66 pounds), significantly higher than even the highest end of weight ranges for 5-year-old patients. Libervant's FDA-approved label goes so far as to include instructions on not operating a motor vehicle after taking Libervant—clearly not an instruction appropriate or intended for 2 to 5-year-old children. These kinds of labeling statements facilitate improper "off-label" marketing by

4

Aquestive for older patients, and in fact misbrand Libervant.  *See* 21 U.S.C. § 352(a).

10.     FDA's approval of Libervant was arbitrary and capricious and contrary to its own policies in multiple additional ways.  FDA approved Libervant for 2 to 5-year-olds based on pharmacokinetic data for just 6 patients in that population even though FDA had obligated Neurelis in 2021 to provide data from a 30-patient study with pharmacokinetic and clinical endpoints in order to expand Valtoco's approved age range.  And FDA did not account for the safety concerns raised by Libervant's route of administration, which largely prohibits or eliminates safe application during certain seizure episodes—including because the person administering the oral film could be accidentally bitten by the patient or the patient could be injured by the insertion of fingers into the patient's mouth.

11.     FDA may attempt to claim that it approved Libervant on the theory that Libervant is "clinically superior" to previously approved drugs.  Such a finding could not justify approval as a legal matter: although a statutory provision added in 2017 enables FDA to grant an *additional* sequential 7-year exclusivity period to the same drug for the same disease upon a finding of clinical superiority, that authority only applies after any existing exclusivity period has terminated.  FDA Reauthorization Act of 2017, Pub. L. No. 115-52, § 607(a)(2)(A), 131 Stat. 1005 (2017).  It does not authorize early termination of Valtoco's exclusivity period.  In any event, Libervant could not have demonstrated clinical superiority to Valtoco.  Libervant's buccal film (oral) presentation is more difficult to administer than the other approved diazepam products and potentially unusable during a significant portion of seizures (*e.g.*, a buccal film would be impossible to administer to a patient experiencing a seizure during which the patient's jaw would be clenched).  Valtoco, on the other hand, is inherently easier to use "[i]n the context of when this drug is to be given, typically in the middle of a seizure event."  Ex. C (Valtoco Clinical Superiority Findings) at 5.

12.     FDA's approval of Libervant in the face of Valtoco's unexpired orphan drug exclusivity was contrary to law, arbitrary and capricious, an abuse of discretion, and not in accordance with proper procedures.  5 U.S.C. §§ 706(2)(A), (C), (D).  It contravened the express statutory prohibition on approval of the "same drug . . . for the same disease or condition," 21 U.S.C. § 360cc(a), and demonstrably exceeded FDA's authority.  Blessing FDA's pediatric subpopulation gambit would upset critical incentives for orphan drug development that the ODA is designed to promote, sow chaos among patients and healthcare providers, and facilitate impermissible off-label promotion.

13.     The Court should vacate and set aside FDA's approval of Libervant and any accompanying grant of orphan drug exclusivity for Libervant, and enjoin Defendants from approving any application for a drug that violates Valtoco's statutory exclusivity period.

## PARTIES

14.     Plaintiff Neurelis is the holder of approved New Drug Application No. 211635 for Valtoco.  Neurelis is a private company with its principal place of business at 3430 Carmel Mountain Road, Suite 300, San Diego, CA 92121.  Neurelis advertises, sells, and distributes its drugs in this District and nationwide.

15.     Xavier Becerra is the Secretary of Health and Human Services and the head of HHS.  He is sued in his official capacity.

16.     HHS is a United States government department.  HHS's headquarters and principal place of business are at 200 Independence Avenue, S.W., Washington, D.C. 20201.

17.     Robert Califf is the Commissioner of Food and Drugs and the head of FDA. He is sued in his official capacity.

18.     FDA is a United States government administrative agency and a division of HHS.

FDA's headquarters and principal place of business are at 10903 New Hampshire Avenue, Silver Spring, MD 20993.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1346.  This action arises under the APA, 5 U.S.C. §§ 701-06, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

20.     Venue is proper in this district under § 1391(e)(1)(A) and (B).  Defendants HHS and the Secretary have their principal place of business in Washington, D.C, and Defendants FDA and the Commissioner perform a significant amount of their official duties in this district.

21.     FDA's decision to approve Libervant is a final agency action reviewable under the APA.  5 U.S.C. § 704.

22.     Aquestive has recently stated that it is prepared to effectuate its approval and, on information and belief, is preparing to imminently launch Libervant.  Ex. D (Aquestive Apr. 29, 2024 Press Release).  FDA's unlawful approval of Aquestive's 2 to 5-year-old product will facilitate marketing by Aquestive to older pediatric and adult patients, which in multiple material respects threatens irreparable harm to Neurelis.

## REGULATORY BACKGROUND

**I.     The New Drug Framework**

23.     As a general matter, no "new drug" may enter the market without first obtaining FDA approval through a new drug application, or NDA.  21 U.S.C. § 355(a).

24.     FDA will approve an NDA only if the application includes sufficient evidence of safety and "substantial evidence" of effectiveness from "adequate and well-controlled investigations."  21 U.S.C. §§ 355(c)-(d); *see also id.* §§ 321(p), 331(d), 355(a).  To seek approval

of an NDA, the drug sponsor typically undertakes a lengthy and resource-intensive development program.  The sponsor performs rigorous scientific studies to demonstrate the drug's safety and efficacy, including: laboratory testing; preclinical (animal) testing; multiple phases of clinical studies; developing chemistry, manufacturing, and controls information; and developing label information to direct physician prescribing.

25.    FDA's approval of an NDA is tied to the indication and other conditions of use included in the drug's labeling.  21 U.S.C. § 355(d); 21 C.F.R. § 201.57(c)(15)(i) ("[A]ny clinical study that is discussed in prescription drug labeling . . . must not imply or suggest indications or uses" for which the drug is not approved).  In addition to generating voluminous data, all NDA applicants must submit labeling that includes a "concise statement of each of the product's indications," 21 C.F.R. § 201.57(a)(6), which the agency approves when it approves an NDA.

26.    With exceptions not relevant here, drug sponsors are not permitted to market or promote their drugs for off-label uses, or uses other than those included in the approved labeling.  21 U.S.C. § 355(c)-(d).  Rather, promotional materials must be consistent with FDA-approved labeling.  *See* 21 U.S.C. §§ 352(a), 352(gg), 355(c), 355(d); U.S. Food & Drug Admin., *Guidance for Industry: Medical Product Communications That Are Consistent With the FDA-Required Labeling—Questions and Answers*, at 10 (Jun. 2018), available at https://www.fda.gov/media/133619/download.

27.    For orphan drug purposes, FDA will separately designate a disease in the pediatric population only if there are clinically relevant differences between the populations such that the disease in the pediatric population "is in fact a different disease from the disease in the adult population."  *See* U.S. Food & Drug Admin., *Guidance for Industry*: *Clarification of Orphan Designation of Drugs and Biologics for Pediatric Subpopulations of Common Diseases*, at 4 (Jul.

8

2018) (a "pediatric-subpopulation designation [is] no longer necessary to promote pediatric studies."), available at https://www.fda.gov/media/109496/download.  Thus, "[i]f a disease is rare (i.e., the prevalence of the disease is less than 200,000), a drug may be eligible for designation for the entire disease. *The pediatric population, as part of the population being affected by that disease, would be covered under that orphan designation*." *Id*. at 1 (emphasis added).  On information and belief, FDA has denied orphan drug designation for pediatric subpopulations in keeping with this agency policy.

28.     FDA did not separately designate pediatric and adult indications when it designated Diastat, Valtoco, or Libervant, and it has not separately designated a *young* pediatric population (2 to 5-year-olds) with respect to seizure clusters.

29.     As a general matter, FDA does not permit a new indication to be added (or an existing one to be modified) during the pendency of an NDA if the new indication will necessitate review of new clinical or in vitro data.  *See* U.S. Food & Drug Admin., *Guidance for Industry: Submitting Separate Marketing Applications and Clinical Data for Purposes of Assessing User Fees* (Dec. 2004), available at https://www.fda.gov/media/72397/download.  However, a sponsor may amend a tentatively approved applications, for instance to add a new patient subpopulation (such as a pediatric subpopulation).  *See*, *e.g.*, U.S. Food & Drug Admin., *Guidance for Industry: ANDA Submissions—Amendments and Requests for Final Approval to Tentatively Approved ANDAs* (Jan. 2024), available at https://www.fda.gov/media/119718/download.

## II.     The Orphan Drug Act

30.     "The process of submitting an NDA is both onerous and lengthy," *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 476 (2013).  It involves considerable time and expense and significant risk.  Development of drugs treating rare, "orphan" diseases has faced particular challenges.  For

a drug manufacturer, it has been difficult, or even impossible, to recoup (and hence to justify) investments in drugs that would be marketed to, and used by, only a very small patient population.

31.     Congress enacted the ODA in 1983 in order to provide financial incentives to encourage investment in the development of drugs intended to treat rare diseases, defined as affecting 200,000 or fewer people.  Pub. L. No. 97-414, § 1(b), 96 Stat. at 2049; 21 U.S.C. §§ 360aa-360ee; 21 U.S.C. § 360bb(a)(2).  The primary incentive established by the ODA is orphan drug exclusivity: a seven-year period of marketing exclusivity for approved, orphan-designated drugs.

32.     Congress's decision to grant the holders of successful orphan drug applications seven years of marketing exclusivity was the result of purposeful consideration of the benefits needed to incentivize drug manufacturers to advance treatments for orphan diseases.  *See* H.R. Rep. No. 100-473, at *6 (1987) (weighing the potential benefits and drawbacks of offering seven years of market exclusivity); *see also* Pub. L. No. 97-414, § 1(b)(4), 96 Stat. at 2049 (recognizing that manufacturers of drugs for rare diseases or conditions could "reasonably expect the drug to . . . incur a financial loss" without a period of exclusivity).

     *i.*     *The Scope of Orphan Drug Exclusivity*

33.     Congress set up a two-step process for conferring exclusivity on an orphan drug: "designation as an orphan drug followed by FDA approval results in market exclusivity." *Catalyst,* 14 F.4th at 1302.

34.     *First*, an orphan drug will be granted orphan drug designation under 21 U.S.C. § 360bb if the drug, when approved, will treat a "rare disease or condition."  The ODA defines "rare disease or condition" for purposes of orphan drug designation to mean "any disease or condition which (A) affects less than 200,000 persons in the United States, or (B) affects more

than 200,000 in the United States and for which there is no reasonable expectation that the cost of developing and making available in the United States a drug for such disease or condition will be recovered from sales in the United States of such drug."  21 U.S.C. § 360bb(a)(2).

35.      Obtaining orphan drug designation is comparatively straightforward for the first drug candidate intended to treat a particular rare disease or condition.  When a drug has previously been approved to treat the same disease or condition, however, orphan drug designation for another "same drug" will be granted only if the sponsor provides a medically plausible hypothesis that its product will be clinically superior to all previously approved versions of the drug by demonstrating the new drug's greater efficacy and safety, or a major contribution to patient care.  *See* 21 C.F.R. § 316.20.

36.      *Second*, if an orphan-designated drug receives FDA approval and, if required, proves its medically plausible superiority hypothesis, that drug receives orphan drug exclusivity. 21 U.S.C. §§ 360cc(a), (c).  During a period of orphan drug exclusivity, FDA "may not approve another application . . . for the same drug for the same disease or condition" for seven years, except in two enumerated circumstances. *Id.* §§ 360cc(a)-(b).  This prohibition limits FDA's authority to approve competing drugs "by removing FDA discretion to approve the marketing of certain other drugs[.]" *Depomed, Inc. v. U.S. Dep't of Health & Human Servs.*, 66 F. Supp. 3d 217, 233 (D.D.C. 2014).

37.      Specifically, the Orphan Drug Act provides:

> Except as provided in subsection (b), if the Secretary--
> (1) approves an application filed pursuant to section 355 of this title, or
> (2) issues a license under section 262 of Title 42
> **for a drug designated under section 360bb** of this title **for a rare disease or condition**, the Secretary may not approve another application under section 355 of this title or issue another license under section 262 of Title 42 **for the same drug for the same disease**

*or condition* for a person who is not the holder of such approved application or of such license until the expiration of seven years from the date of the approval of the approved application or the issuance of the license.

21 U.S.C. § 360cc(a) (emphasis added).

38. During the seven-year period of exclusivity, FDA lacks authority to approve another company's version of the same drug to treat the same rare disease unless one of two narrow exceptions applies: (1) the agency finds, after notice and an opportunity to be heard, that the sponsor of the drug with orphan drug exclusivity "cannot ensure the availability of sufficient quantities of the drug to meet the needs of persons with the disease or condition for which the drug was designated"; or (2) the sponsor of the drug with orphan drug exclusivity provides written consent to the "approval of other applications . . . before the expiration of such seven-year period." *Id.* § 360cc(b)(1)-(2). Thus, "[d]uring the 7-year period described in subsection (a)," FDA may not "approve an application . . . for a drug that is otherwise the same . . . as the already approved drug for the same rare disease" unless such approval is needed to address drug shortages or the exclusive drug's holder agrees to waive exclusivity. *Id.*

*ii. The Eleventh Circuit's Rejection of a Patient Subpopulation Exception to Orphan Drug Exclusivity*

39. The Eleventh Circuit is the only court (other than the district court in the decision before it) to have considered whether FDA may approve a second or subsequent NDA for treatment of a different patient population with the same disease or condition, notwithstanding an existing orphan drug exclusivity.[1] The issue before the court of appeals was whether FDA may approve an NDA for the treatment of a disease in pediatric population despite the pendency of

---

[1] The different, but related issue, of whether FDA can "break" orphan drug exclusivity based on a finding of clinical superiority is presented in *Jazz Pharmas., Inc. v. Becerra*, No. 1:23-cv-01819 (D.D.C. 2023), which is currently pending in this District.

orphan drug exclusivity for a drug intended to treat the same disease in adult population.  *See Catalyst*, 14 F.4th at 1306.  The Eleventh Circuit held that "the clear statutory language" unambiguously foreclosed FDA's interpretation.  *Id.* at 1312-13.  The court explained:

> § 360cc(a) provides that if the FDA approves an 'application filed pursuant to section 355 of this title ... for a drug designated under section 360bb ... for a rare disease or condition, the Secretary may not approve another application under section 355 ... for the same drug for the same disease or condition' until the expiration of seven years. …  The only 'disease or condition' already referred to in § 360cc(a) is the 'rare disease or condition' for which the drug was 'designated under § 360bb.'  The ordinary and plain meaning of 'same drug or condition' read in the context of this sentence yields only one result—the term unambiguously refers to the 'rare disease or condition' designated under § 360bb.  Thus, the scope of exclusivity under § 360cc(a) is determined by what has been designated under § 360bb.

*Id.* at 1308.

40.    FDA subsequently announced that it would ignore the Eleventh Circuit decision and persist in its view that the ODA "does not unambiguously require that orphan-drug exclusivity extend to the entire disease or condition for which a drug received orphan-drug designation if the drug is only approved for some uses within that disease or condition."  U.S. Food & Drug Admin., *Clarification of Orphan-Drug Exclusivity Following Catalyst Pharms., Inc. v. Becerra*, 88 Fed. Reg. 4086 (Jan. 24, 2023) (notification).  FDA asserted that it will continue to apply its regulations under which, as characterized by the agency, "a drug approved for a new use or indication *within* the same orphan-designated disease or condition may also be eligible for orphan-drug exclusivity for such use or indication."  *Id.* at 4087 (emphasis added).  FDA cited no statutory authority for its position, pointing only to its own, decades-old regulations.  Those regulations were superseded by the statutory amendments described below, and, in any event, they cannot overrule the statute's plain language.

*iii. The ODA's Clinical Superiority Provisions*

41.    Prior to 2017, the statutory provisions governing orphan drug exclusivity made no mention of "clinical superiority."  FDA was concerned, however, that the plain text of the ODA's exclusivity provision allowed for sequential periods of exclusivity for the same drug.  After the first period of orphan drug exclusivity for the first approved drug with that active moiety expired, the blocking provision no longer applied, and a subsequent manufacturer could obtain orphan drug designation and then approval of a drug to treat a particular disease, automatically triggering a second or subsequent exclusivity period.

42.    FDA addressed this issue by introducing, through regulations, the concept of clinical superiority.  When a subsequent applicant sought approval for the "same drug for the same rare disease or condition" that FDA had previously approved, FDA required the applicant to submit a "medically plausible hypothesis for the possible clinical superiority" to obtain orphan designation.  *See* 21 C.F.R. § 316.25(a)(3).  Assuming the prior drug's exclusivity had expired, FDA then required a demonstration of clinical superiority for the new application to receive exclusivity when approved.  *Id.* § 316.34(c).  FDA also defined "same drug," as that term was used to refer to the scope of orphan exclusivity, to exclude a later-in-time clinically superior drug even if it had the same active moiety.  *See id*. § 316.3(14)(i).  This regulatory structure enabled FDA to approve a second or subsequent drug that used the same active moiety *after* the first drug's period of orphan exclusivity expired—but only if FDA found that the second or subsequent drug was clinically superior.

43.    In promulgating these regulations, FDA acknowledged that "Congress ha[d] set forth only two situations in which exclusive marketing rights can be removed" and that FDA was "without authority" to create additional exceptions.  57 Fed. Reg. 62076, 62084 (Dec. 29, 1992).

14

44.     The D.C. Circuit and other courts of this District rejected FDA's interpretation and held that FDA did not have authority under the ODA to impose the clinical superiority requirement as a prerequisite for awarding a subsequent period of orphan drug exclusivity.  *See Eagle Pharms., Inc. v. Azar (Eagle II)*, 952 F.3d 323, 340 (D.C. Cir. 2020); *Eagle Pharms., Inc. v. Azar (Eagle I)*, 2018 WL 3838265, at *6 (D.D.C. 2018); *Depomed*, 66 F. Supp. 3d at 237 (Jackson, J.).  As the D.C. Circuit explained, "the express language of [section 527(a) of the FDCA] requires the FDA to give a drug seven years of market exclusivity upon designating it as an orphan drug and approving it, *leaving no room for the FDA's imposition of the clinical-superiority requirement*." *Eagle II*, 952 F.3d at 329 (internal quotation marks and citation omitted) (emphasis added).  And because section 527(b) expressly enumerates exceptions to that requirement of section 527(a), courts should not "impute to Congress an intention to authorize an exception that Congress itself did not think worth enacting."  *Depomed*, 66 F. Supp. 3d at 233 (citation omitted).

45.     The reasoning of *Depomed*, *Eagle I*, and *Eagle II* likewise precluded FDA from crafting a clinical superiority exception permitting it to "break" orphan drug exclusivity to approve a "clinically superior" drug for the "same disease or condition" during the 7-year exclusivity period, if the "clinically superior" drug and the already-approved drug shared the same active moiety.  *See, e.g.*, *Depomed*, 66 F. Supp. 3d at 232.  Indeed, as now-Justice Jackson observed in *Depomed*, section 527 of the FDCA "plainly incentivizes investment in drugs for rare diseases and conditions *precisely because* it prevents new *(and potentially better)* drugs from being adopted and marketed for that same condition."  *Id.* at 235 (second emphasis added).

46.     In 2017, Congress amended the ODA to include a limited clinical superiority provision establishing the conditions under which a subsequent drug may earn so-called "serial" exclusivity, *i.e.*, a new period of orphan drug exclusivity for the subsequent same drug for the same

disease or condition, once the prior period of exclusivity had expired.  But Congress did not expand

the exceptions to the exclusivity period in § 360cc(b).  It did not allow for early termination of an

existing exclusivity period upon a finding that a newly approved second or subsequent drug was

clinically superior.

47.     Instead, the 2017 amendments added new authority for FDA to require a

demonstration of clinical superiority as a condition of granting a new period of orphan drug

exclusivity to a subsequent "same drug":

> If a sponsor of a drug that is designated under section 526 and is
> otherwise the same, as determined by [FDA], as an already approved
> or licensed drug **is seeking exclusive approval or exclusive
> licensure described in subsection (a)** for the same rare disease or
> condition as the already approved drug, [FDA] shall require such
> sponsor, as a condition of such exclusive approval or licensure, to
> demonstrate that such drug is clinically superior to any already
> approved or licensed drug that is the **same drug**.

Pub. L. No. 115-52, Tit. VI, § 607(a)(3), 131 Stat. 1049 (adding 21 U.S.C. § 360cc(c)) (emphasis

added); 163 Cong. Rec. H5483 (daily ed. Jul. 12, 2017) (statement of Rep. Walters) (explaining

that the 2017 amendments "provide[d] [FDA] with *new* statutory authority to require the sponsor

of an orphan-designated drug, which has certain similarities to an already approved drug, to

demonstrate 'clinical superiority' compared to the already approved drug *as a condition of

receiving seven years of market exclusivity*." (emphasis added)).

48.     The 2017 amendments defined "clinically superior" to mean that "the drug provides

a significant therapeutic advantage over and above an already approved or licensed drug in terms

of greater efficacy, greater safety, or by providing a major contribution to patient care."  21 U.S.C.

§ 360cc(c)(2).  As a result, to establish "clinical superiority," an applicant must demonstrate one

of the following: (1) greater effectiveness than the approved drug; (2) greater safety in a

"substantial portion of the target populations"; or (3) in "unusual cases," if neither greater safety

nor greater effectiveness has been established, a demonstration that the drug "otherwise makes a major contribution to patient care."  21 C.F.R. § 316.3(b)(3)(i)-(iii); *see also Eagle Pharms., Inc., v. Burwell*, No. 16-cv-00790-GK (D.D.C. Oct. 19, 2016), ECF No. 34 (memorandum from Dr. Henry H. Startzman III, Director of FDA's Orphan Drug Designation Program) ("the sponsor of a drug that is allegedly clinically superior to a previously approved drug bears the burden of demonstrating that its drug meets the applicable regulatory criteria") (citing 56 Fed. Reg. 3338, 3343 (Jan. 29, 1991)).

49.    The amendments confirmed that FDA could not evade § 360cc(a)'s ban on approval of a "same drug" during a prior drug's 7-year exclusivity period via regulations redefining the term "same drug" to exclude clinically superior drugs.  To the contrary, the new "clinical superiority" provision makes clear that a "clinically superior" drug is still the "same drug" as another drug with the same active moiety.  Subsection 360cc(c)(1) explains that, to obtain serial exclusivity, a drug sponsor must "demonstrate that such drug is clinically superior to any already approved or licensed drug that is the same drug."  That text—which contemplates that a clinically superior drug "is the same drug"—is irreconcilable with any prior FDA regulation defining "same drug" to exclude clinically superior drugs.  Indeed, if the term "same drug" in the orphan drug exclusivity guarantee in subsection (a) excluded a subsequent drug that is clinically superior to the previously approved drug, subsection (c) would be rendered meaningless—it would be impossible to "demonstrate" that a drug is clinically superior to any previously approved "same drug" because establishing clinical superiority would mean the drugs are *not* the same.  And, as noted, Congress did not add any new exceptions to the enumerated exceptions in § 360cc(b) or authorize FDA to create new exceptions to the 7-year bar on approvals.

50.    Finally, the 2017 amendments acknowledged that there might be conflicts between

FDA's new authority and its preexisting regulations. So, Congress explained, until FDA had promulgated new regulations, the agency "may apply any definitions set forth in [the pre-2017] regulations" only "to the extent such definitions are not inconsistent with the terms of this section, as amended." Pub. L. No. 115-52, Tit. VI, § 607(a)(3), 131 Stat. 1049–50 (adding 21 U.S.C. § 360cc(d)).

51.     FDA has not yet amended its orphan-drug regulations to implement the 2017 amendments.

52.     In sum, once FDA approves an orphan-designated drug, triggering orphan exclusivity, FDA cannot approve a third party's application for the same drug for the same disease or condition during the pendency of the statutory seven-year period unless *either*: (1) the sponsor of the first-approved drug cannot sufficiently supply the market, *or* (2) the sponsor of the drug with orphan drug exclusivity consents. 21 U.S.C. § 360cc(b)(1)-(2). There are no other circumstances under which FDA can "break" a drug's existing orphan exclusivity period to approve another "same drug" for the "same disease or condition," including upon a demonstration that the later drug is "clinically superior" to the first. *Compare* 21 U.S.C. § 360cc(b) ("Exceptions"), *with* 21 U.S.C. § 360cc(c) ("Condition of clinical superiority" for later-approved applications).

## FACTUAL BACKGROUND

**I.     FDA's Orphan Drug Designation and Approval for Neurelis' Valtoco and Tentative Approval for Libervant**

53.     Beginning in 2010, Neurelis invested significant time and resources into developing Valtoco, including multiple clinical trials demonstrating the safety and effectiveness of Valtoco in treating seizure clusters.

54.     FDA granted Valtoco orphan drug designation in 2015 for "management of acute

18

repetitive seizures" on the basis of its major contribution to patient care compared to Diastat (diazepam rectal gel).  Because Diastat had already been approved, Neurelis was required to provide a plausible hypothesis of clinical superiority in order to attain orphan drug designation for Valtoco.  21 U.S.C. § 360bb(a); 21 C.F.R. § 316.20(a).   FDA found that "Valtoco's intranasal route of administration provides a major contribution to patient care over the rectal route of administration by providing a significantly improved ease of use."  Ex. C (Valtoco Clinical Superiority Findings) at 5.

55.     The "rare disease or condition" authorizing Valtoco's orphan drug designation under 21 U.S.C. § 360bb(a) was "acute repetitive seizures."  FDA's designation did not include any age-based limitation or suggest that acute repetitive seizures are a different disease or condition in particular patient subpopulations.

56.     Libervant likewise sought and received orphan drug designation for the same rare disease or condition—"treatment of . . . acute repetitive seizures"—in 2016, before Valtoco was approved.  Ex. E (FDA, Orphan Drug Database entry for Libervant).  Because FDA made this orphan designation prior to the approval of Valtoco, Libervant's hypothesis of clinical superiority did not include a comparison against Valtoco or any finding that Libervant was clinically superior to Valtoco.  Since Valtoco's approval, however, any new orphan drug designation for a diazepam product would require such a plausible hypothesis of clinical superiority.

57.     Aquestive recognized that once Valtoco was approved, the NDA for Libervant would be blocked by Valtoco's orphan exclusivity.   Aquestive attempted to negotiate an exclusivity waiver with Neurelis, but Neurelis did not agree to a waiver.

58.     On January 10, 2020, FDA approved Valtoco as indicated for the acute treatment of seizure clusters.  FDA's approval of Valtoco represented a major advance in the treatment of

cluster or acute repetitive seizures—particularly because of the ease of administration during an active seizure.  This condition is challenging to treat and highly disruptive in the lives of epilepsy patients and their caregivers.  In approving Valtoco, FDA recognized that it provided a major contribution to patient care compared to Diastat (diazepam rectal gel) given the ease of nasal (as compared to rectal) administration, and recognized that Valtoco was clinically superior to Diastat. Ex. C (Valtoco Clinical Superiority Findings) at 5.  FDA also confirmed that Neurelis was entitled to seven years of orphan drug exclusivity for Valtoco, until January 10, 2027.  Ex. F (FDA, Valtoco Orphan Drug Database Entry); *see also* 21 U.S.C. § 360cc(c).  FDA noted that Valtoco was eligible for this period of exclusivity because it was clinically superior to Diastat as a result of Valtoco's major contribution to patient care.  Ex. C (Valtoco Clinical Superiority Findings) at 5.

59.    In 2021, Neurelis met with FDA to seek alignment around development of its diazepam nasal spray for patients in the 2 to 5-year-old age range.  FDA advised that Neurelis would need to provide both pharmacokinetic and clinical safety endpoint data from at least 30 patients in the 2 to 5-year-old age range to expand Valtoco's approved indication.

60.    In early 2020, Aquestive submitted an NDA for Libervant, seeking FDA approval of Libervant for the same indication as Diastat and Valtoco—*i.e.*, acute treatment of seizure clusters—in older pediatric and adult patients.  After receiving a complete response letter from FDA, Aquestive resubmitted its NDA for Libervant on June 24, 2021.  On August 30, 2022, FDA *tentatively* approved the Libervant NDA, which is distinct from a final NDA approval and does not allow for marketing or sale of a drug.  21 C.F.R. § 314.105.  FDA explained that Neurelis's orphan drug exclusivity blocked it from approving the Libervant NDA:

> The Orphan Drug provisions of the FD&C Act, 21 U.S.C. §§ 360aa-
> 360dd, provide for a grant of seven years of market exclusivity to
> which a period of pediatric exclusivity may attach.  Orphan drug
> exclusivity blocks approval of any other application for the same

drug for the same indication or use.  ***Due to the orphan exclusivity granted to Neurelis Inc., Valtoco, your application for Libervant may not be finally approved for marketing under section 505 of the FD&C Act until the period has expired.***

Ex. B (Tentative Approval Letter from FDA to Aquestive (Aug. 30, 2022)) at 1 (emphasis added).

61.    After Valtoco was approved, Aquestive began to assert—without any evidentiary basis—that the Libervant buccal film represents a major contribution to patient care over both a nasal spray (*i.e.*, Valtoco) and a rectal gel (*i.e.*, Diastat).

62.    Aquestive itself acknowledged that "Libervant [was] under an orphan drug block to market access until January 2027."  Ex. G (Aquestive Sept. 11, 2023 Press Release).  Yet, Aquestive continued to assert that Libervant was clinically superior to Valtoco, and undertook unlawful, pre-approval promotions.  Ex. H (Aquestive promotional materials).

63.    Aquestive sought to evade Neurelis' exclusivity period and continued to seek FDA approval for Libervant, attempting to convince FDA that its product was clinically superior to Valtoco without any scientific basis.  For example, Aquestive asserted that the efficacy of Valtoco may be affected by the patient's consumption of food, relying on a grievously flawed study and even though FDA already had clearly rejected this theory.  Ex. I (Petition Response Letter from FDA CDER to Arent Fox LLP, Docket No. FDA-2019-P-5121, (Jan. 10, 2020)) at 13-14.

64.    When that route proved unsuccessful, Aquestive submitted a second NDA for the same drug and the same condition, but this time limited to patients aged 2 to 5.  (Valtoco is FDA approved for patients aged 6 and older.)  Ex. G (Aquestive Sept. 11, 2023 Press Release).

65.    Aquestive's new NDA contained data from only 6 patients in that age range (only 20 percent of the number of patients Neurelis was obligated to include for the same demonstration in patients of the same age range) and even then without data on clinical endpoints from patients treated with Libervant. Ex. J (copy of Libervant poster presentation).

66.     Ordinarily, a sponsor wishing to make a change to an indication in a tentatively approved application (like Aquestive's initial application) will submit that change as an amendment to the application, not as a wholly new application.  *See generally* U.S. Food & Drug Admin., *Guidance for Industry: Submitting Separate Marketing Applications and Clinical Data for Purposes of Assessing User Fees*, at 5-6 (Dec. 2004), available at https://www.fda.gov/media/72397/download.  FDA has explained, for instance, that when a generic drug applicant needs to update labeling to reflect changes in indications for a tentatively approved abbreviated new drug application, that sponsor is expected to submit the proposed changes in the form of an amendment to the tentatively approved application.  *See* U.S. Food & Drug Admin., *Guidance for Industry: ANDA Submissions – Amendments and Requests for Final Approval to Tentatively Approved ANDAs*, at 9-10 (Jan. 2024) available at https://www.fda.gov/media/119718/download.

67.     Nonetheless, FDA split the Libervant NDA—contradicting its own policies—and accepted and filed Aquestive's second NDA for a modified indication, rather than requiring the existing tentatively approved NDA to be amended to include the additional patient population at issue.  FDA's decision to file the new NDA in contravention of its policies was, on information and belief, intended to evade FDA's previous recognition that the Orphan Drug Act precluded approval of Libervant through January 10, 2027.

## II.     FDA's Approval of Libervant for Patients Aged 2 to 5

68.     On April 26, 2024, FDA approved Libervant (diazepam) for the acute treatment of intermittent, stereotypic episodes of frequent seizure activity (*i.e.*, seizure clusters, acute repetitive seizures) that are distinct from a patient's usual seizure pattern in patients aged 2 to 5.  Ex. A (Approval Letter from FDA to Aquestive (Apr. 26, 2024)).  FDA's approval letter offered no

explanation or justification for its decision to approve the same drug (diazepam) for the same condition (seizure clusters) during Valtoco's exclusivity period and did not acknowledge the agency's own prior conclusion in a 2022 letter to Aquestive that such an approval would be unlawful.

69.     The approved labeling for Libervant explains that the safety and effectiveness of Libervant in pediatric patients 2 to 5 years of age was established using data comparing Libervant only against diazepam rectal gel, almost entirely in adult and older pediatric patients.  In fact, on information and belief, of the 205 patients included in clinical studies referenced in the Libervant approved labeling for 2 to 5-year-olds, only six patients (or fewer than 3 percent) were 2 to 5 years of age. *See* Ex. K (Libervant 2-5 labeling, USPI Section 14) at 18-19.

70.     The section of Libervant dealing with use in pediatric patients explains that "[u]se of LIBERVANT in [the 2-5] age group is supported by evidence from adequate and well-controlled studies of diazepam rectal gel in adult and pediatric patients" older than 2-5, as well as "adult bioavailability studies comparing LIBERVANT with diazepam rectal gel."  Ex. K (Libervant 2-5 labeling, USPI Sections 14, 8.4) at 18-19, 12.  In short, the Libervant labeling, as approved by FDA, indicates that FDA determined Libervant is safe and effective in 2-5 year old children *because* it is safe and effective in adults and older children.

**FDA'S APPROVAL OF LIBERVANT MUST BE VACATED AND SET ASIDE**

**I.     FDA's Approval of Libervant Is Contrary to Law, Exceeds FDA's Statutory Authority, and is Arbitrary and Capricious**

71.     Libervant is the "same drug" as Valtoco for purposes of orphan drug exclusivity; diazepam is the active moiety for both drugs.  Both drugs received orphan drug designation for the same "disease or condition," *i.e.*, cluster seizures, and Valtoco was approved for this disease or condition.  They are, under the ODA, "the same drug for the same disease or condition." 21 U.S.C.

§ 360cc(a).

72.     Under the plain language of the statute, FDA is prohibited from approving the "same drug for the same disease or condition" "until the expiration of seven years from the date of the approval" of an orphan drug. *Id.*; *see also Catalyst*, 14 F.4th at 1301-03. Thus, the ODA unambiguously forbids FDA from approving Libervant for treatment of seizure clusters until January 10, 2027.

73.     Yet on April 26, 2024, during the pendency of Valtoco's orphan drug exclusivity, FDA approved Libervant for treatment of cluster seizures.

74.     This approval exceeded FDA's authority and is contrary to law.

**A.     The ODA Does Not Permit Approval of a New NDA for the "Same Drug" for "the Same Disease of Condition" on the Basis of a Different Patient Population**

75.     FDA designated Valtoco as an "orphan drug" for the treatment of cluster seizures in 2015, and, in 2020, approved Valtoco for treatment of cluster seizures in patients aged 6 and older. Seizure clusters are the same condition in all people with epilepsy who have these kinds of seizures, regardless of their age; a 5-year-old with cluster seizures has the same disease as a 6-year-old. Valtoco's orphan drug designation applied to all people suffering from the condition. As in *Catalyst*, "there is nothing in the record to suggest that the FDA qualified its § 360bb designation with an age-restriction." 14 F.4th at 1308.

76.     The plain statutory language of the ODA unambiguously precludes approval of the "same drug" for "the same disease or condition" merely because the approval targets a different segment of the patient population. The scope of exclusivity under the statute is tied to the drug's designation—the "disease or condition"—even if such designation is broader than its approved indication.

77.     The word "same" in § 360cc(a) refers to the "disease or condition" for which the

drug at issue was "designated under section 360bb."  As the Eleventh Circuit explained, "[t]he word 'same' [in the clause 'same disease or condition'] is being used in the sense of 'being the one under discussion or already referred to.'  The only 'disease or condition' already referred to in § 360cc(a) is the 'rare disease or condition' for which the drug was 'designated under § 360bb.'  The ordinary and plain meaning of 'same drug or condition' read in the context of this sentence yields only one result—the term unambiguously refers to the 'rare disease or condition' designated under § 360bb."  *Catalyst*, 14 F.4th at 1308.  Thus, "the scope of exclusivity under § 360cc(a) is determined by what has been designated under § 360bb."  *Id.*

78.     The *Catalyst* court rejected FDA's argument that it is ambiguous "whether 'same disease or condition' refers to the 'use' approved by the FDA to treat a disease or condition pursuant to § 355," rather than "to the 'rare disease or condition' designated by the FDA pursuant to § 360bb."  *Id.* at 1308-09.  "If Congress wanted to make the 'use or indication' inquiry relevant to a holder's market exclusivity for an orphan drug, it could have done so by including such language in § 360cc(a)."  *Id.* at 1309.  Congress has not done so.  Rather, § 360cc(a) references § 355 only to identify what must occur to trigger market exclusivity (approval of an NDA under § 355) and what FDA is prohibited from doing once market exclusivity is triggered (approving another application under § 355).

79.     The ODA's definition of the term "rare disease or condition" also confirms that a pediatric subpopulation is not a distinct disease or condition.  A "rare disease or condition" is "any disease or condition which (A) affects less than 200,000 persons in the United States, or (B) affects more than 200,000 in the United States and for which there is no reasonable expectation that the cost of developing and making available in the United States a drug for such disease or condition will be recovered from sales in the United States of such drug."  21 U.S.C. § 360bb(a)(2).  Thus,

a disease or condition is "rare" if it meets one of two statutory conditions—both of which are about the number of people affected by the disease or condition, not the specific use for which the drug is approved.

80.    Allowing a pediatric or other patient subpopulation to constitute a distinct "rare disease or condition" in the absence of any clinically significant distinction between presentation of the disease in each subpopulation would vastly expand the reach of the Orphan Drug Act in contravention of Congress's intent.  Many diseases that affects millions of people (and for which the ODA's special incentives are not needed) would qualify as orphan diseases affecting fewer than 200,000 people if the disease were instead construed to be, for example, only in "patients aged under 5."

81.    Although FDA continued to assert in a policy statement responding to *Catalyst* that it may approve the same drug for the same disease if the new approval is limited to a patient subpopulation, FDA's position contravenes the plain, unambiguous text of the ODA, and its approval of Libervant notwithstanding Valtoco's orphan drug exclusivity is unlawful, contrary to statute, and in excess of FDA's authority.

**B.    Under FDA's Policy and Practice, Pediatric Subpopulations Are Not Separate "Diseases," and Any Conclusion that Seizure Clusters in Five-Year-Olds is a Separate Disease from Seizures Clusters in Six-Year-Olds Is Arbitrary and Capricious**

82.    FDA's own policies reflect that pediatric subpopulations do not generally or automatically present separate diseases from the overall disease.  As FDA has explained in public guidance, "[i]f a disease is rare (i.e., the prevalence of the disease is less than 200,000), a drug may be eligible for designation for the entire disease.  The pediatric population, as part of the population being affected by that disease, would be covered under that orphan designation."  Food & Drug Admin., *Guidance for Industry: Clarification of Orphan Designation of Drugs and Biologics for*

*Pediatric Subpopulations of Common Diseases Guidance for Industry* (Jul. 2018), available at https://www.fda.gov/media/109496/download.  Likewise, FDA will separately designate a disease in the pediatric population only if it "is in fact a different disease from the disease in the adult population." *Id*. at 2.

83.     FDA never separately designated seizure clusters in 2 to 5-year-old patients as a separate disease from seizure clusters in older patients, and any such designation would have been arbitrary and capricious because there is no clinical or scientific support for a conclusion that the disease presents differently or is treated differently in different patient subpopulations.  FDA's designation of Libervant in 2016 as an orphan drug made no reference to any separate pediatric subpopulation.  And the agency based its approval of Libervant in 2-5-year-old patients on data derived almost entirely from older pediatric and adult patients.

84.     Indeed, the evidence presented by Libervant in the 2-5 NDA is clearly insufficient to support approval as a separate indication.  Libervant's labeling falsely states that its safety and effectiveness have "been established" in the 2 to5-year-old pediatric subpopulation, when in fact the evidence on which the Libervant NDA was predicated was almost entirely in adults and older pediatric patients.  FDA acted arbitrarily and capriciously by approving Libervant's NDA for pediatric population aged 2 to 5 on the basis of this data, in an unlawful effort to evade the Orphan Drug Act's exclusivity requirements.

85.     Because FDA has never found that seizure clusters in the 2 to 5-year-old population are "in fact a different disease from the disease in the adult population," any approval of Libervant on the theory that Libervant was designed for a different disease than Valtoco departs without explanation from FDA's own policies and procedures. U.S. Food & Drug Admin., *Guidance for Industry*: *Clarification of Orphan Designation of Drugs and Biologics for Pediatric*

*Subpopulations of Common Diseases* (Jul. 2018), available at https://www.fda.gov/media/109496/download.   That too renders FDA's action arbitrary and capricious.  *See Fort Stewart Schs. v. Fed. Lab. Rel. Auth.*, 495 U.S. 641, 654 (1990) ("an agency must abide by its own regulations") (citations omitted); *F.C.C. v. Fox Television Stations*, 556 U.S. 502, 515 (2009) (an agency must "provide reasoned explanation for its action" and "may not . . . depart from a prior policy sub silentio or simply disregard rules that are still on the books"); *Ciox Health LLC, v. Azar*, 435 F. Supp. 3d 30, 59 (D.D.C. 2020) (the APA requires "clear recognition and articulation of a policy change") (citing *Fox Television*, 556 U.S. at 515).

86.     For these reasons, FDA's approval of Libervant is arbitrary, capricious, an abuse of discretion, and/or not in accordance with law.

II.     **FDA's Approval of Libervant Ignores Evidence of Intended Off-Label Use for Older Pediatric and Adult Patients**

87.     FDA may not approve a drug for which the labeling is "false or misleading in any particular."  21 U.S.C. § 355(d); *see also* 21 C.F.R. §§ 201.57(c)(2)(iv) and (15)(i).  This prohibition includes a drug where the clear intended use is not included in the labeling.  21 U.S.C. § 355(d); 21 C.F.R. § 201.57(c)(15)(i) ("[A]ny clinical study that is discussed in prescription drug labeling … must not imply or suggest indications or uses" for which the drug is not approved).  In other words, the approved label must match the approved use, and cannot contemplate some use that is not approved.  *See* 21 C.F.R. §201.128 (noting that the "labeling claims" are evidence of intended use).

88.     In addition, FDA's regulations bar it from "approving a [subsequent drug] that is 'intended' for the same use as the pioneer during its seven-year exclusivity period."  *Spectrum Pharms., Inc. v. Burwell*, 824 F.3d 1062, 1068 (D.C. Cir. 2016) (citing 21 C.F.R. § 316.3(b)(12), (14)).  In *Spectrum*, the D.C. Circuit held that FDA's regulations require it to look to a subsequent

drug's labeling to ensure that the labeling does not provide objective evidence of an intended unapproved use for which the pioneer drug has orphan drug exclusivity.  *Id.* at 1068-69.

89.     Libervant's labeling shows that it is clearly intended for use in older pediatric patients and adults, and the Libervant labeling violates the FDCA and FDA's regulations by including statements that suggest that Libervant can be safely and effectively used for older pediatric and adult patients even though the only approved use is in children aged 2 to 5.  For example, the labeled weight-based dosing for Libervant permits up to 15 mg to be administered in a single dose.  While this maximum approved dose is ostensibly for only children 26-30 kg by weight (heavier than children aged 5 and younger), it is the *same dose* as that approved for older pediatric and adult patients in other diazepam products (up to 55 kg for Valtoco and up to 75 kg for Diastat).  Ex. K (Libervant 2-5 labeling, USPI Section 2.2) at 4.  And, the approved label for Libervant permits up to two doses per episode per patient.  *Id*.

90.     Perhaps even more clearly reflecting an intended use in the older pediatric population, the Libervant Medication Guide cautions users that Libervant may make them drowsy, and expressly warns: "[d]o not allow your child to drive a motor vehicle, operate machinery, or ride a bicycle until you know how LIBERVANT affects your child."  Ex. K (Libervant 2-5 labeling, USPI Section 17) at 24.  Of course, children aged 2 to 5 cannot drive motor vehicles or operate machinery—and it would be quite rare to see a 2- or 3-year old riding a bicycle.

91.     FDA appears to have deliberately disregarded evidence that Aquestive is clearly anticipating, and in fact intending, off-label use in older pediatric and adult patients.  In fact, by approving Libervant in this very small patient population while the primary Libervant NDA remains under tentative approval, and by approving a label that contemplates use in older pediatric and adult patients, FDA is facilitating the off-label use of Libervant across the board.

92.     For these reasons, FDA's approval of Libervant is arbitrary, capricious, an abuse of discretion, and/or not in accordance with law.

### III.    FDA Cannot Claim Authority to Break Valtoco's Orphan Drug Exclusivity on the Basis of Purported "Clinical Superiority"

93.     The statute permits ongoing orphan drug exclusivity to be "broken" only in two enumerated circumstances: (1) if FDA makes a formal finding after notice and an opportunity to be heard that Valtoco is in shortage, or (2) Neurelis provides its express written consent.  21 U.S.C. § 360cc(b).  Neither exception is applicable here.

94.     To the extent FDA may claim that it has made a determination of clinical superiority for Libervant, it still did not have authority under the ODA to approve Libervant and break Valtoco's exclusivity.  *First*, any such action would constitute an *ultra vires* insertion of a third exception to orphan drug exclusivity that exceeds FDA's statutory authority.  *See id.*  As the *Depomed* and *Eagle II* courts clearly explained, FDA does not have the authority to "authorize an exception that Congress itself did not think worth enacting."  *Depomed*, 66 F. Supp. 3d at 233 (citation omitted).

95.     That the ODA lacks any such exception is confirmed by the 2017 amendments, in which Congress specifically created a clinical superiority requirement for a *new* period of exclusivity but did *not* create such an option to break unexpired orphan drug exclusivity.  Congress's decision to codify *only one aspect* of FDA's prior practice confirms that it did  not intend for clinical superiority to  function as a third exception to § 360cc(a) or otherwise provide a basis for the agency to break an unexpired period of orphan drug exclusivity.  *See Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a

requirement manifest.").

96.     In addition, the post-2017 text of the ODA precludes FDA from defining the term "same drug" to exclude drugs that are clinically superior to the previously approved drug. Such an interpretation is irreconcilable with the text of recently added § 360cc(c), which states that a "clinically superior" drug is the "same drug" as the inferior drug with the same active moiety. FDA's interpretation would also render § 360cc(c) a nullity, because no drug could ever be both the "same drug" and a "clinically superior" drug as required to satisfy § 360cc(c).

97.     FDA's use of a non-statutory exception to break Valtoco's orphan drug exclusivity and approve Libervant would be contrary to law. *See, e.g.*, *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616-17 (1980) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent."); *In re England*, 375 F.3d 1169, 1178 (D.C. Cir. 2004) (Roberts, J.) ("Where a statute contains explicit exceptions, the courts are reluctant to find other implicit exceptions.") (quoting *Detwiler v. Pena*, 38 F.3 591, 594 (D.C. Cir. 1994)); *Depomed*, 66 F. Supp. 3d at 222.

98.     *Second*, there is no basis whatsoever for the agency to have concluded that Libervant is clinically superior to previously approved drugs, particularly based on the extremely limited amount of data presented for the approved patient subpopulation. In fact, Libervant presents many of the same limitations as Diastat, including, critically, the potential inability to administer during certain types of active seizures. It also raises issues unique to buccal film, like the impact of a patient's vomiting during a seizure and expelling the medicine. There is simply no evidence that Libervant is clinically superior to Valtoco; it is not. Any such conclusion would be arbitrary and capricious.

99.     Moreover, to the extent that FDA *now* considers Libervant to be clinically superior,

and to the extent that FDA believes it is permitted to "break" orphan drug exclusivity on this basis, that is an arbitrary and unexplained reversal of its prior position that the "application for Libervant may not be finally approved for marketing" until the orphan drug exclusivity for Valtoco has expired.  Ex. B (Tentative Approval Letter from FDA to Aquestive (Aug. 30, 2022)) at 1.  FDA's unexplained change of position renders its action arbitrary and capricious.

## CAUSES OF ACTION

### COUNT ONE—Unlawful Agency Action, 5 U.S.C. § 706(2)(C)

100.   Neurelis re-alleges and incorporates by reference all prior and subsequent paragraphs.

101.   Section 706 of the Administrative Procedure Act authorizes courts to "hold unlawful and set aside agency action, findings, and conclusions found to be … in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

102.   FDA's approval of Aquestive's new drug application for Libervant during the pendency of Valtoco's statutory orphan drug exclusivity violates the plain command of the ODA and exceeds FDA's statutory authority.

103.   FDA's approval of Libervant as clinically superior to Valtoco is also contrary to the statute, and ignores the statutory restrictions on FDA's authority.

104.   FDA's approval of Libervant is therefore "in excess of [FDA's] statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

### COUNT TWO—Arbitrary and Capricious Agency Action, 5 U.S.C. § 706(2)(A)

105.   Neurelis re-alleges and incorporates by reference all prior and subsequent paragraphs.

106.   Section 706 of the Administrative Procedure Act authorizes courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

107.    FDA's approval of Aquestive's new drug application for Libervant for treating seizure clusters in patients aged 2 to 5 is inadequately supported and constitutes an unexplained change in position.

108.    FDA's approval of Libervant impermissibly ignores the intended improper unapproved use reflected in Libervant's labeling, in violation of FDA's own regulations.

109.    FDA's approval of Aquestive's labeling inviting an unapproved use violates FDA's regulations.

110.    FDA's approval of Libervant is therefore "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

**COUNT THREE—Declaratory Judgment Act, 28 U.S.C. §§ 2201-02**

111.    Neurelis re-alleges and incorporates by reference paragraphs all prior and subsequent paragraphs.

112.    The Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, provides that, "[i]n the case of actual controversy within its jurisdiction," a federal court "may declare the rights and other legal relations of any interested party seeking such declaration."

113.    Defendants' actions were unauthorized, arbitrary and capricious, in excess of authority, and unlawful.

114.    Neurelis has been harmed, and continues to be harmed, by Defendants' unlawful actions.

115.    For the foregoing reasons, an actual and justiciable case or controversy exists between Neurelis on one side and Defendants on the other.

116.    Neurelis is entitled to judgment declaring FDA's approval of Libervant void, invalid, and unenforceable.

**PRAYER FOR RELIEF**

Wherefore, Neurelis respectfully requests that this Court enter the following relief:

1.      Declare, adjudge, and decree that Defendants' approval of Aquestive's new drug application for Libervant is arbitrary, capricious, in excess of statutory authority, and contrary to law;

2.      Hold unlawful and set aside Defendants' approval of Libervant;

3.      Permanently enjoin Defendants, and their officers, agents, employees, assigns, and all persons acting in concert or participating with them, from granting approval to any new drug application for Libervant during the pendency of Valtoco's orphan drug exclusivity status, until January 10, 2027;

4.      Award Neurelis its costs and attorney's fees and expenses as allowed by law; and

5.      Award such other relief as this Court deems just and proper.

Dated: May 29, 2024

Respectfully submitted,

/s/ Elisabeth S. Theodore
Eva A. Temkin (D.C. Bar 985494)
Elisabeth S. Theodore (D.C. Bar 1021029)
ARNOLD & PORTER KAYE SCHOLER
   LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
eva.temkin@arnoldporter.com
elisabeth.theodore@arnoldporter.com

*Counsel for Plaintiff Neurelis Inc.*