# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NEURELIS, INC., | ) |
| Plaintiff, | ) |
| v. | ) |
| SARA BRENNER,[1] et al., | ) |
| Defendants, | )   Case No. 24-cv-1576 (APM) |
| and | ) |
| AQUESTIVE THERAPEUTICS, INC., | ) |
| Intervenor-Defendant. | ) |

## MEMORANDUM OPINION

## I.    INTRODUCTION

Congress enacted the Orphan Drug Act ("ODA") to encourage pharmaceutical companies to develop treatments for rare diseases that affect a small portion of the population.  Among the Act's various economic incentives is a seven-year period of marketing exclusivity for a first-to-market "orphan drug" that secures approval from the Food and Drug Administration ("FDA").

Plaintiff Neurelis, Inc. ("Neurelis") and Intervenor-Defendant Aquestive Therapeutics, Inc. ("Aquestive") each manufacture an orphan drug intended to treat the rare condition of acute repetitive seizures.  Neurelis was first to bring its drug, Valtoco, to market.  In January 2020, the FDA approved Valtoco to treat acute repetitive seizures in patients ages six and older and granted

---

[1] The court substitutes as a defendant the current Acting Commissioner of the Food and Drug Administration, Sara Brenner, for the outgoing Commissioner, Robert Califf.  *See* Fed. R. Civ. P. 25(d).

Neurelis marketing exclusivity for seven years.  During an exclusivity period, the ODA generally bars the FDA from approving "another application" for a drug that is the "same drug for the same disease or condition" as the approved drug.  21 U.S.C. § 360cc(a).  In this case, that meant the ODA generally prohibited the FDA from approving the "same drug" as Valtoco "for the same disease or condition" for a seven-year period.

Approximately four years later, on April 26, 2024, the FDA approved Aquestive's drug, Libervant, also to treat acute repetitive seizures.  Under the FDA's longstanding interpretation of the ODA, it "will not approve another sponsor's marketing application for the same drug for the same *use or indication* before the expiration" of the previously approved drug's exclusive marketing period.  21 C.F.R. § 316.31(a) (emphasis added).  The FDA determined that Valtoco and Libervant were the "same drug," insofar as they both rely on the same active moiety,[2] diazepam.  Both drugs also treat the same "disease or condition"—acute repetitive seizures.  Still, the FDA approved Libervant during Valtoco's exclusivity period because it has a different "use or indication"—namely, Libervant was determined to be safe and effective for patients two to five, whereas Valtoco was approved only for patients ages six and older.  Libervant's distinct "use or indication," the FDA reasoned, justified approving it despite Valtoco's existing term of marketing exclusivity.  Using that same logic, the FDA also granted Libervant its own seven-year period of marketing exclusivity for treatment in the two- to five-year old patient population.

In late 2023, prior to Libervant's approval, Neurelis submitted a supplemental new drug application to expand Valtoco's approval to pediatric patients under the age of six.  About a year later, on December 18, 2024, the FDA refused to grant Neurelis final approval to market Valtoco to that population because eight months earlier it had approved Libervant for that same use.

---

[2] The FDA defines "[a]ctive moiety" to mean "the molecule or ion . . . responsible for the physiological or pharmacological action of the drug substance." 21 C.F.R. § 316.3(b)(2).

The FDA explained that Libervant's seven-year period of marketing exclusivity blocked approval of Valtoco's use in the youngest pediatric patients.

On May 29, 2024, Neurelis brought this action under the Administrative Procedure Act ("APA"), challenging the FDA's approval of Libervant. Neurelis claims that the FDA committed three errors. First, it argues that, because Libervant is the "same drug for the same disease or condition" as Valtoco, § 360cc(a) of the ODA barred the FDA from approving Libervant during Valtoco's seven-year period of exclusivity. Second, Neurelis maintains that the FDA unlawfully approved Libervant because its labeling reflects an intended use for adults and older pediatric patients, subpopulations for which only Valtoco has marketing exclusivity. Third, it contends that the FDA acted arbitrarily and capriciously by approving Libervant based on less evidence than the Agency demanded from Neurelis to secure approval for the same pediatric subpopulation.

In December 2024, Neurelis moved for preliminary injunctive relief after the FDA refused to allow Valtoco's marketing to the youngest pediatric patients. Neurelis asks the court to order the FDA to withdraw its approval of Libervant and thus clear the way for the marketing of Valtoco for patients ages two to five.

Before the court are the parties' cross-motions for summary judgment and Neurelis's motion for a preliminary injunction. The court holds that, under § 360cc(a) of the ODA, the FDA was prohibited from approving Libervant during Valtoco's unexpired period of exclusivity. For that reason, the court (1) grants Neurelis's motion for summary judgment, (2) denies Defendants' cross-motions, and (3) enters judgment in favor of Neurelis and directs the FDA to vacate its approval of Libervant. Neurelis's motion for injunctive relief is denied as moot.

## II.    BACKGROUND

### A.    The Orphan Drug Act

In 1983, Congress passed the ODA as an amendment to the Food, Drug, and Cosmetic Act of 1938.  *See* Pub. L. No. 97-414, 96 Stat. 2049 (Jan. 4, 1983).  Its purpose was to encourage the development of so-called "orphan drugs," that is, drugs that are "designed to treat a rare disease or condition that historically received little attention from pharmaceutical companies."  *Spectrum Pharms., Inc. v. Burwell*, 824 F.3d 1062, 1064 (D.C. Cir. 2016).  "When the potential market for a drug is small because the target market is relatively small, it is difficult for a pharmaceutical manufacturer to recover the large research and development costs, and even more difficult to realize a worthwhile return on that investment."  *Baker Norton Pharms., Inc. v. FDA*, 132 F. Supp. 2d 30, 31 (D.D.C. 2001).  Congress therefore devised the ODA to "reduce the costs" and "provide financial incentives" to develop orphan drugs.  96 Stat. at 2049, § 1(b)(5).

These inducements operate at two stages: designation and approval.  A drug in development first must be designated as an "orphan drug" by the FDA for a specific rare disease or condition.  21 U.S.C. § 360bb.[3]  Designation provides the drug sponsor certain financial benefits, including tax credits, assistance with investigations and the approval process, and monetary grants to offset the costs of development.  *Id.* § 360aa(a), 360ee; 26 U.S.C. § 45C.  Once a drug is designated, the manufacturer still must complete the drug's development and establish that it is both safe and effective to secure final approval from the FDA, a process that can take years.  21 U.S.C. § 355(a), (b).

---

[3] Congress made the Secretary of Health and Human Services responsible for carrying out the ODA, but the Secretary does so through the FDA Commissioner.  *See Eagle Pharms., Inc. v. Azar*, 952 F.3d 323, 325 n.2 (D.C. Cir. 2020) (citing 21 U.S.C. § 393(d)(2)).  For ease of reference, the court refers to the FDA throughout this opinion, instead of the Secretary.

A first-to-market orphan drug can receive an important financial benefit under the ODA: a seven-year period of marketing exclusivity. The ODA provides that if the FDA "approves an application filed pursuant to section 355" for a drug designated as an orphan drug "for a rare disease or condition," it "may not approve another application under section 355 . . . for the same drug for the same disease or condition . . . until the expiration of seven years from the date of the approval of the approved application[.]" 21 U.S.C. § 360cc(a). Thus, the ODA generally bars the FDA from approving another orphan drug application "for the same drug for the same disease or condition" until the earlier-approved drug's seven-year period of marketing exclusivity ends.[4]

For decades, the FDA has tied the scope of marketing exclusivity under ODA to the specific "indication" for which the drug is approved, not the targeted disease or condition. An "indication" can include treatment for a specific patient subpopulation. The FDA made this point when promulgating its original ODA regulations. It observed that:

> An indication for treatment of a specific disease or condition could involve all patients with that disease or condition or a specified subpopulation of those with the disease or condition. . . . Exclusive approval for a disease subset would not bar approval of the same drug for the larger population or other subsets of population by different sponsors, however, if that were later deemed appropriate.

*See Orphan Drug Regulations*, 56 Fed. Reg. 3338, 3339 (Jan. 29, 1991). Thus, the FDA understood that the ODA permitted it to approve a later-in-time "same drug," even if for the "same disease or condition" as an earlier-approved drug, so long as the subsequent drug was for a different indication, such as an unapproved patient population. The earlier-approved drug's marketing exclusivity would not block approval of a later drug in such circumstances.

---

[4] There are statutory exceptions to this general rule, but none apply in this case. *See* 21 U.S.C. § 360cc(b), (c); *Catalyst Pharms., Inc. v. Becerra*, 14 F.4th 1299, 1312 (11th Cir. 2021) (identifying "three statutory exceptions" set forth in § 360cc(b), (c)).

The FDA codified the relationship between marketing exclusivity and an orphan drug's "indication" in its regulations.  It did so by defining the term "[o]rphan-drug exclusive approval or exclusive approval" to mean that, "effective on the date of FDA approval . . . , no approval will be given to a subsequent sponsor of the same drug product for the same *indication* for 7 years." 21 C.F.R. § 316.3(b)(12) (1993 ed.) (emphasis added).

Twenty years later, in 2013, the Agency amended the definition of "orphan-drug exclusive approval or exclusive approval" to its present form.  *See Orphan Drug Regulations*, 78 Fed. Reg. 35117, 35132–33 (June 12, 2013).  It inserted the words "use or" before "indication," such that the revised regulation states that the FDA will not approve the application of a subsequent sponsor of "the same drug for the same use or indication" during an existing exclusivity period.  21 C.F.R. § 316.3(b)(12) (2013).  It also added a sentence to the end of the definition, stating that "[a] designated drug will receive orphan-drug exclusive approval only if the same drug has not already been approved for the same use or indication."  *Id.*  The Agency made these changes to its regulation "to clarify that FDA recognizes orphan-drug exclusivity for the designated drug only if the same drug has not already been approved for the same use or indication."  78 Fed. Reg. at 35128.

To drive home the point, the FDA modified a related regulation titled "Scope of orphan-drug exclusive approval," 21 C.F.R. § 316.31.  Newly added subsection (b) provides:

> Orphan-drug exclusive approval protects only the approved indication or use of a designated drug.  If such approval is limited to only particular indication(s) or uses(s) within the rare disease or condition for which the drug was designated, FDA may later approve the drug for additional indication(s) or uses(s) within the rare disease or condition not protected by the exclusive approval.

*Id.* § 316.31(b) (2013). The FDA added subsection (b) to clarify "that the scope of orphan exclusive approval is limited to the indication(s) or use(s) for which the designated drug is approved." 78 Fed. Reg. at 35118.

### B.    Factual and Procedural Background

#### 1.    Acute Repetitive Seizures

Acute repetitive seizures is a condition that occurs in patients with epilepsy who experience periodic seizure clusters despite receiving treatment. AR21.[5] Patients who suffer from the disease experience "intermittent, stereotypic episodes of frequent seizure activity . . . that are distinct from a patient's usual seizure pattern." AR18. Acute repetitive seizures is a "rare disease or condition" for purposes of the ODA. AR23.

In 1997, the FDA approved Diastat, a rectal gel, for treatment of acute repetitive seizures in patient ages two and up and granted it marketing exclusivity through July 2004. AR22. Diastat's active moiety, *see supra* note 2, is diazepam. AR1. Valtoco's and Libervant's active moiety is the same. *Id.*

#### 2.    Neurelis and Valtoco

On November 16, 2015, the FDA granted Neurelis's request for orphan drug designation of Valtoco, a nasal spray formulation of diazepam for "[m]anagement of [acute repetitive seizures]." AR22; AR1578. Because Diastat and Valtoco contain the same "active moiety" and are intended for the same use, the FDA required Neurelis to "present a plausible hypothesis that its drug may be clinically superior to" Diastat to secure orphan drug designation. AR19 (citing 21 CFR § 316.20(a)). Neurelis successfully did so based on a showing that drug delivery through a nasal spray provided a major contribution to patient care over a rectal gel. AR22; AR1570;

---

[5] The parties' Joint Appendix contains the relevant portions of the administrative record ("AR") and can be found at ECF No. 39-1. For ease of reference, the court simply cites to the page number in the "AR."

*see also* 21 C.F.R. § 316.3(b)(3)(iii) (defining a "[c]linically superior" drug to mean, among other things, one that "makes a major contribution to patient care," even though "neither greater safety nor effectiveness has been shown").  The FDA's designation of Valtoco was not specific to a particular patient population.  AR1578.

Approximately five years later, the FDA approved Valtoco's new drug application ("NDA") in January 2020 for "the treatment of [acute repetitive seizures] in patients with epilepsy 6 years of age and older."  AR1.  Having secured the requisite designation under § 360bb and subsequent approval under § 355, the FDA granted Valtoco a seven-year period of marketing exclusivity for treatment in patients ages six years and older.  AR1.  That exclusivity period expires on January 10, 2027.  *Id.*  After receiving exclusivity, Neurelis began work to secure approval for use in the youngest pediatric patients—ages two to five.  Pl.'s Mot. for Prelim. Injunction, Decl. of Craig Chambliss [Chambliss Decl.], ECF No. 49-2 ¶ 6.

### 3.    *Aquestive and Libervant*

Neurelis was not the only company working on an easier method of delivering diazepam to patients with acute repetitive seizures.  Aquestive was, as well.  It developed Libervant, which delivers diazepam through a soluble film that is placed inside the patient's mouth and absorbed through the lining of the cheek.  AR22.  On November 10, 2016, Libervant received orphan drug designation from the FDA.  AR1577.

In November 2019, before Valtoco's approval, Aquestive submitted an NDA for Libervant to treat patients ages 12 and older.  AR24.  Due to deficiencies in the application, the FDA did not approve it.  *Id.*  Aquestive resubmitted its NDA in June 2021, but by this time the FDA had approved Valtoco.  *Id.*; AR18.  In August 2022, the FDA gave Libervant tentative but not final approval "[d]ue to the [orphan drug exclusivity ("ODE")] granted to" Valtoco.  AR1490.  The

FDA explained that Libervant was the "same drug" (*i.e.*, contained the same active moiety: diazepam) and sought "approval for an indication that is protected by Valtoco's ODE" (*i.e.*, for use in acute repetitive seizures patients ages 12 and older). AR27. The FDA therefore could not approve it unless Aquestive "demonstrate[d] that Libervant is clinically superior to, and therefore not the same drug as, Valtoco." *id.*; 21 C.F.R. § 316.3(b)(14)(i) (defining "same drug" to mean "a drug that contains the same active moiety as a previously approved drug and is intended for the same use as the previously approved drug . . . , except [ ] if the subsequent drug can be shown to be clinically superior to the first drug"). The FDA determined that Libervant was not clinically superior to Valtoco and therefore "Valtoco's ODE block[ed] approval" of Libervant. AR55.

The next year, on June 28, 2023, Aquestive again sought approval of Libervant, but this time for a narrower subpopulation—only patients "2 to 5 years of age." AR921. The FDA eventually approved Aquestive's narrowed NDA. AR1. Although it acknowledged that "Valtoco's ODE blocks approval of the same drug for the *same* use or indication (the treatment of acute repetitive seizures in patients with epilepsy 6 years of age or older)," the Agency reasoned that "Valtoco's ODE does not block approval of the same drug for a *different* use or indication, including for treatment of acute repetitive seizures in patients with epilepsy less than 6 years of age." AR2 (emphasis added) (citation omitted). Because Aquestive sought approval only for the two- to five-year old population, which "is a different indication from the treatment of [acute repetitive seizures] in patients with epilepsy 6 years of age and older," Valtoco's exclusivity did not block the approval of Aquestive's narrowed NDA "under a straightforward application of FDA's regulations." *Id.* The FDA therefore approved Libervant for use in that limited subpopulation and granted it a seven-year exclusivity period. AR2; *see* Chambliss Decl., Ex. B.

### 4.    *Neurelis's Supplemental NDA*

In late 2023, Neurelis submitted a supplemental NDA seeking to expand Valtoco's approved use to a subpopulation not covered by its prior approval: ages two to five.  Chambliss Decl. at ¶ 7.  On December 18, 2024, the FDA granted Neurelis only tentative approval because Libervant has "orphan-drug exclusivity for patients between the ages of 2 to 5, which block[ed] final approval" until Libervant's "exclusivity expires on April 26, 2031."  *Id.* ¶ 9; *id.*, Ex. A.  On that same date, the FDA published on its website both exclusivity and clinical superiority determinations for Libervant.  *Id.* ¶ 11, *id.*, Exs. B, C.  The posting stated that Libervant's exclusivity was based not on its clinical superiority to Valtoco, but to Diastat, the long-ago approved diazepam rectal gel.  *Id.*, Ex. C at 46 (CM/ECF pagination) ("Libervant's buccal route of administration provides a major contribution to patient care over rectal route of administration by providing a significantly improved ease of use.").  The FDA's decision to grant Libervant exclusivity based on superiority to Diastat, rather than Valtoco, appears to be consistent with the FDA's position that the scope of exclusivity is tied to the specific use or indication for which a drug is approved.

### 5.    *Procedural History*

Neurelis filed this lawsuit on May 29, 2024, challenging the FDA's approval of Libervant.  *See generally* Compl., ECF No. 1.  On June 29, 2024, the court granted Aquestive's unopposed motion to intervene as a defendant.  *See* Order, ECF No. 8.

Neurelis moved for summary judgment on August 19, 2024.  *See generally* Mem. of P&A in Supp. of Pl.'s Mot. for Summ. J, ECF No. 25-1 ("Pl.'s Mot.").  The FDA and Aquestive thereafter cross-moved for summary judgment on September 18, 2024.  *See generally* Mem. in Supp. of Federal Defs.' Cross-Mot. for Summ. J. & Opp'n to Pl.'s Mot., ECF No. 31-1 ("FDA's

Mot."); Combined Mem. in Supp. of Aquestive's Mot. for Summ. J. & in Opp'n to Pl.'s Mot., ECF No. 29-1 ("Aquestive's Mot.").  Then, on December 20, 2024, after the FDA only tentatively approved Valtoco's supplemental NDA, Neurelis moved for a preliminary injunction seeking to vacate Libervant's approval.  *See generally* Mem. in Supp. of Mot. for Prelim. Injunction, ECF No. 49-1, ("PI Mot.").

## III.    LEGAL STANDARD

In cases that involve review of a final agency action under the APA, the district court "sits as an appellate tribunal," and "the entire case on review is a question of law."  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (internal quotation marks and citations omitted).  The court's review is limited to the administrative record, and "its role is limited to determining whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  *Philip Morris USA Inc. v. FDA*, 202 F. Supp. 3d 31, 45 (D.D.C. 2016) (cleaned up).

Under the APA, an agency action may be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The arbitrary-and-capricious standard is "highly deferential" and "presumes the validity of agency action."  *Nat'l Ass'n of Clean Air Agencies v. EPA.*, 489 F.3d 1221, 1228 (D.C. Cir. 2007) (cleaned up).  That deference does not, however, extend to matters of statutory construction.  *See Loper Bright Enterprises v. Raimondo*, 606 U.S. 369, 387 (2024).  Instead, "courts must exercise independent judgment in determining the meaning of statutory provisions."  *Id*. at 394.

## IV.    DISCUSSION

Neurelis challenges the approval of Libervant on three grounds.  First, because Valtoco and Libervant are "the same drug for the same disease or condition," it maintains that the FDA's

approval of Libervant during Valtoco's unexpired period of exclusivity contravened § 360cc(a) of the ODA. Pl.'s Mot. at 15–24. Second, Neurelis claims that the FDA should have refused to approve Libervant because the drug's labeling implies that Aquestive intends to unlawfully market the drug for unapproved use in patients six and older. *Id.* at 24–28. Third, Neurelis urges that the FDA acted arbitrarily and capriciously by requiring less evidence for Libervant's approval than it did for Valtoco's approval for the same subpopulation. *Id*. at 28–37. Because the court agrees with Neurelis that the FDA's approval of Libervant violated § 360cc(a), the court does not reach its second and third arguments.

### A.    Section 360cc(a) of the ODA

As with any case involving statutory interpretation, the court starts with the statutory text. The disputed provision of the ODA provides in relevant part as follows:

> Except as provided in subsection (b), if the Secretary—
>
> (1) approves an application filed pursuant to section 355 of this title, or
>
> (2) issues a license under section 262 of Title 42
>
> for a drug designated under section 360bb of this title for a rare disease or condition, the Secretary may not approve another application under section 355 of this title or issue another license under section 262 of Title 42 for the same drug for the same disease or condition for a person who is not the holder of such approved application or of such license until the expiration of seven years from the date of the approval of the approved application or the issuance of the license.

21 U.S.C. § 360cc(a). This section of the ODA codifies a period of marketing exclusivity for a first-to-market orphan drug. Once the FDA approves an orphan drug application for a drug designated under § 360bb for "a rare disease or condition," § 360cc(a) prohibits the Agency from approving for seven years another application for "the same drug for the same disease or condition."

All parties in this case agree that Valtoco and Libervant are the "same drug." Pl.'s Mot. at 17; Aquestive's Mot. at 19; FDA's Mot. at 14; AR1–2, 1490. The active moiety in both is diazepam, and there is no claim that Libervant is a different drug because it is "clinically superior" to Valtoco. *See Jazz Pharms., Inc. v. Becerra,* No. 23-cv-01819 (APM), 2024 WL 4625731, at *12 (D.D.C. Oct. 30, 2024) (holding that, in the context of § 360cc(a), "same drug" does not include a drug that is "clinically superior" to an approved drug). The parties also agree that Valtoco and Libervant are used to treat "the same disease or condition," *i.e.*, acute repetitive seizures. From there, the parties part ways. They disagree on whether, during an approved drug's exclusivity period, § 360cc(a) prohibits the FDA from approving another application for the "same drug for the same disease or condition" but intended for a different "use or indication." Neurelis says that the ODA does not grant the FDA such authority; the FDA and Aquestive take the opposite view.

Neurelis advocates a straightforward reading of § 360cc(a) to support its position. It argues that, by using the phrase "same disease or condition," Congress "unambiguously require[s] tying the scope of exclusivity to the designation under § 360bb," Pl.'s Mot. at 20, which is a preliminary step to exclusive approval and granted as to a specific rare disease or condition, *see supra* Section II.A. Further, § 360cc(a)'s use of the term "disease or condition" "unambiguously forecloses tying exclusivity to the 'use or indication' for which a drug was approved." Pl.'s Mot. at 20. According to Neurelis then, the FDA ignored the statute's plain text when it approved Libervant. Because "Libervant is the same drug as Valtoco, and FDA approved it to treat the same rare disease or condition for which Valtoco received orphan drug designation," the FDA exceeded its statutory authority by approving Libervant during Valtoco's unexpired exclusivity period. *Id.* at 24.

The FDA and Aquestive respond that Neurelis's hyperfocus on the words "same disease or condition" causes it to misread the statute. They say Neurelis improperly reads the phrase

"'same disease or condition' in isolation while ignoring the remainder of § 360cc(a), which cross-references § 355's application," as well as the overall "statutory context and purpose." FDA's Mot. at 22–23. Under their reading, the scope of exclusivity is properly tied not to the designated "disease or condition," but to the use or indication granted in the approved application under § 355. They argue that "both the trigger for exclusivity, and the scope of exclusivity that results, are defined in terms of FDA's approval of *drug applications*." FDA's Mot. at 15 (emphasis added). "[W]here the sponsor obtains both designation and approval, exclusivity operates as a bar on FDA's ability to 'approve another *application* under section 355' 'for the same drug for the same disease or condition.'" FDA's Mot. at 15 (citing 21 U.S.C. § 360cc(a)) (emphasis added). Thus, under the FDA's "holistic[]" reading, "the statutory language [ ] calls for comparing an 'approve[d] . . . application' with 'another application.'" *Id.* (citing § 360cc(a)). Applied here, that means Aquestive's NDA for use only in the ages two-to-five subpopulation did not present "another application" because it presented a different use or indication than Valtoco, which was not yet approved for the youngest pediatric patients. Section 360cc(a) therefore did not require the FDA to deny Libervant's follow-on NDA based on Valtoco's market exclusivity.

## B.    *Catalyst Pharmaceuticals, Inc. v. Becerra*

In evaluating the parties' positions, the court does not write on a clean slate. The Eleventh Circuit resolved this very dispute in *Catalyst Pharmaceuticals, Inc. v. Becerra*. 14 F.4th 1299 (11th Cir. 2021). On virtually identical facts, it rejected Defendants' reading of § 360cc(a).[6]

---

[6] Ultimately, the FDA acquiesced to the ruling in *Catalyst*, but decided not to follow it otherwise. The Agency announced that it would "continue to apply its regulations tying the scope of [ODE] to the uses or indications for which a drug is approved." FDA, Clarification of Orphan-Drug Exclusivity Following *Catalyst Pharms., Inc. v. Becerra*; Notification, 88 Fed. Reg. 4086, 4086 (Jan 24. 2023). The FDA said that it would adhere to its view that "the statutory text does not unambiguously require that [ODE] extend to the entire disease or condition for which a drug received orphan-drug designation if the drug is only approved for some uses within that disease or condition." *Id.* at 4078. It also believed that the "statutory interpretation embodied in its regulations best advances the [ODA's] purposes, appropriately balancing the need to incentivize the development of drugs for rare diseases and conditions with the need to provide patient access to orphan drugs." *Id.*

*Catalyst* involved the drug Firedapse.  Firedapse received an orphan drug designation under § 360bb to treat Lamber-Eaton Myasthenic Syndrome, or LEMS, and the FDA later approved the drug to treat patients ages 18 and older.  *Id*. at 1304.  The FDA also recognized a seven-year period of exclusivity for Firedapse under § 360cc(a).  *Id*.  Less than six months later, however, the FDA approved another drug for the treatment of LEMS, Ruzurgi, but only for the patient population ages six to seventeen.  *Id*. at 1305.  Its rationale for the approval will sound familiar.  The FDA acknowledged that Ruzurgi and Firedapse were the "same drug" and that both treated the "same disease or condition."  Still, it determined that § 360cc(a) did not bar approval of Ruzurgi because its application was for a different "indication or use," *i.e.*, a different patient population.  *Id*.  Under the agency's longstanding regulations, § 360cc(a) did not foreclose Ruzurgi's approval even during Firedapse's unexpired exclusivity period.  *Id*.

The Eleventh Circuit disagreed with the FDA's reading of § 360cc(a).  It explained that

> the word 'same' [for purposes of the term 'same disease or condition' in § 360cc(a)] is being used in the sense of 'being the one under discussion or already referred to.'  The only 'disease or condition' already referred to in § 360cc(a) is the 'rare disease or condition' for which the drug was 'designated under § 360bb.'

*Catalyst Pharms.*, 14 F.4th at 1308.  "Thus, the scope of exclusivity under § 360cc(a) is determined by *what has been designated* under § 360bb."  *Id.* (emphasis added).  The court further noted that Congress could have made "use or indication" the key inquiry to breaking market exclusivity, but it chose not to use those terms in the statute.  *Id.* at 1309.  Because the FDA had designated Firedapse under § 360bb for treatment of LEMS (without restriction on population), and later approved its NDA for that "rare disease or condition," § 360cc(a) barred the FDA from approving Ruzguri during Firedapse's exclusivity term.  *Id*. at 1313.  It was the "same drug" as Firedapse and "for the same disease or condition," LEMS.

The FDA raised the principal argument that Defendants make here, which is that the statute's reference to "application" ties the scope of exclusivity to the application's approved use or indication.  The court declined to read § 360cc(a) in that way.  It explained that the references to the application "simply identify what must occur to trigger market exclusivity (approval of an application . . .) and what the FDA is prohibited from doing once both the designation and approval conditions are met (approve another application . . .)."  *Id.* at 1309.  "There is nothing in the express language of § 360cc that incorporates by reference the substantive provisions, requirements, or limitations of either § 355 or § 262, nor does the context in which the language appears or the structure of § 360cc(a) suggest that be done."  *Id.*

This court wholly agrees with the holding and rationale of *Catalyst* and adopts it as its own.  The plain text of § 360cc(a) is decisive.  The FDA approved an application for Valtoco—a "drug designated under section 360bb" to treat the "rare disease or condition" of acute repetitive seizures.  Libervant shares the same active moiety as Valtoco, and it too is used to manage acute repetitive seizures.  Libervant therefore is the "same drug" as Valtoco "for the same disease or condition."  Accordingly, § 360cc(a) prohibited the FDA from approving the application for Libervant during Valtoco's period of exclusivity.  That is the ODA's clear command, and the FDA violated it.

### C.    Defendants' Contrary Arguments

#### 1.    *The Text and Context of the Statute Do Not Support Defendants' Reading*

Defendants say the Eleventh Circuit got it wrong in *Catalyst*.  They maintain that the court, as Neurelis does here, placed undue emphasis on the words "same disease or condition" and failed

to read § 360cc(a) in context.  FDA's Mot. at 23; Aquestive's Mot. at 24–25.  This court is unpersuaded.

It is, of course, true that "the words of a statute must be read in their context" and that a court must interpret the statute "as a symmetrical and coherent regulatory scheme," fitting, "if possible, all parts into an harmonious whole."  *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (citations omitted).  But "[r]eliance on context and structure in statutory interpretation is a 'subtle business, calling for great wariness lest what professes to be mere rendering becomes creation and attempted interpretation of legislation becomes legislation itself.'" *Eagle Pharms., Inc. v. Azar*, 952 F.3d 323, 332 (D.C. Cir. 2020) (quoting *King v. Burwell*, 576 U.S. 497–98 (2015) (itself quoting *Palmer v. Massachusetts*, 308 U.S. 79, 83 (1939))).  That admonishment squarely applies here.  Defendants' strained reliance on "context and structure" is a "creation" that "becomes legislation itself." *Id.*

Defendants rely heavily on § 360cc's repeated references to the term "application" and suggest that these references tie the scope of marketing exclusivity to the particulars of the approved application.  FDA's Mot. at 15–18; Aquestive's Mot. at 22–25.  But the statute does no such thing.  It requires the FDA simply to compare an approved application with the application seeking approval, and it explicitly sets forth what elements the FDA must compare.  The FDA need only ask whether the two applications are: (1) "for the same drug" and, if so, (2) whether the subsequent application is "for the same disease or condition" identified in the approved application.  If there is a match, then the first drug's unexpired exclusivity period bars approval of the second drug; if not, the ODA authorizes the FDA to approve the later application.

Defendants' focus on the particulars of the approved application has a self-evident problem.  If accepted, it would grant the FDA authority to consider factors that Congress did not

contemplate, and it would enable the FDA to pick and choose the applications' elements that it (not Congress) thinks are relevant. The FDA acknowledges as much. It concedes that § 360cc(a) does not require the applications to be "identical in every respect" for an approved orphan drug with exclusivity to block approval of another application. FDA's Reply in Supp. of FDA's Mot., ECF No. 37-1, at 7 ("FDA's Reply"). It is enough, the FDA says, that the applications "are of the same kind, or will have the same effect, in the respect that is *material* in this context: the drug's use or indication." *Id.* (emphasis in original). But there is no mention of "materiality" in § 360cc(a)—a term Congress surely is familiar with—and relying on that concept injects subjectivity into the process. Under the FDA's approach, a second NDA is not "another application" under § 360cc(a) if the second drug is intended for use in an unapproved patient population. But a later NDA *is* "another application," and therefore subject to being blocked by the first, if it only involves, say, a different dosing regime, means of delivery, or contraindication. Such differences apparently are not "material." The FDA offers no textual basis for such line-drawing.

Next, Defendants point to § 360cc(c), a provision that Congress added in 2017, which allows a second drug sponsor to obtain exclusivity for a drug that is "otherwise the same" as an already approved drug for "the same rare disease or condition" by showing that its "drug is clinically superior to [the] already approved . . . drug." 21 U.S.C. § 360cc(c)(1). A later drug is deemed "clinically superior" if it "provides a significant therapeutic advantage over and above an already approved or licensed drug in terms of greater efficacy, greater safety, or by providing a major contribution to patient care." *Id.* § 3600cc(c)(2). Each Defendant argues, albeit for a slightly different reason, that their reading of § 360cc(a) better aligns with this "clinical superiority" provision than Neurelis's. FDA's Mot. at 18–19; Aquestive's Mot. 26–28.

Aquestive does not emphasize the text of § 360cc(c) as much as its objective.  It asserts that the clinical superiority provision's "manifest purpose is . . . to incentivize the development of *superior* orphan drugs so that orphaned patients aren't forced to rely on *inferior* drugs even if both drugs are 'otherwise the same.'"  Aquestive's Mot. at 27 (emphasis in original) (citations omitted).  Section 360cc(a) should be read the same way.  That is, Congress did not wish for orphan drug exclusivity to "block FDA's ability to approve drugs that benefit patients in ways the original sponsor's NDA did not."  Reply in Supp. of Aquestive's Mot, ECF No. 36-1 ("Aquestive's Reply"), at 12.  Reading § 360cc(a) as Neurelis does would thwart that purpose.

The FDA invokes a more practical concern.  It argues that Neurelis's interpretation of § 360cc(a), if accepted, would complicate matters for the FDA under § 360cc(c).  It asserts that its reading of § 360cc(a) avoids the "quandary" of how to compare "clinical superiority" as between two orphan drugs that are otherwise the same but indicated for use in different populations.  FDA's Mot. at 19.  The Agency's concern seems to be that if, as here, a drug like Voltoco can block approval of the "same drug for the same disease or condition" but for a different patient population, the only way the Agency could approve such later drug by a different sponsor is to determine it to be "clinically superior" under § 360cc(c).  Comparing the "safety," "efficacy," or relative contribution to patient care across subpopulations, the FDA claims, would be a difficult exercise.  *See* 21 U.S.C. § 360cc(c)(2) (defining "clinically superior" to mean "that the drug provides a significant therapeutic advantage over and above an already approved or licensed drug in terms of greater efficacy, greater safety, or by providing a major contribution to patient care").  An indication-focused reading of § 360cc(a) solves that "quandary."

The court finds neither argument persuasive.  Aquestive's purposivist approach cannot overcome the statute's plain text.  True, Congress's goal in enacting the ODA was to incentivize

the development of orphan drugs and to get those drugs to patients in need.  But as the D.C. Circuit said in another case regarding the ODA, "the fact that following the text of a statute may conflict with the statute's larger purpose alone does not warrant departing from the text." *Eagle Pharms.*, 952 F.3d at 334 (citations omitted).  Only when the court is "so convinced by a conflict between text and the purpose" can it conclude that "Congress almost surely could not have meant what it said." *Id.* at 335 (internal quotation marks and citation omitted).  Here, the court sees no inherent tension in Congress making a broad grant of marketing exclusivity that blocks approval of a later drug for a different patient subpopulation.  That is a trade-off Congress surely could have made to incentivize pharmaceutical companies to take the risks associated with developing drugs for rare diseases that, by definition, have small patient populations.  *See id.* at 337 ("Indeed, inherent in any sort of exclusivity period is a tradeoff between incentivizing research and development and promoting competition.").  That Aquestive's reading "may be a more reasonable approach that, in its view, 'harmonizes' the sections of the ODA does not mean that interpreting the text as written contravenes the statute's purpose." *Id.*; *see also Landstar Express Am., Inc. v. Fed. Mar. Comm'n*, 569 F.3d 493, 498 (D.C. Cir. 2009) ("[N]either courts nor federal agencies can rewrite a statute's plain text to correspond to its supposed purposes." (citations omitted)).  The same holds true with respect to the FDA's practical concerns.  The fact that Neurelis's interpretation "*could* result" in some of the challenges that the FDA fears "does not change its obligation to follow the plain text of § 360cc(a)." *Eagle Pharms.*, 952 F.3d at 337 (emphasis in original).

Changing gears, the FDA also looks for support in its longstanding and consistent understanding that § 360cc(a) permits it to consider a drug's "use or indication" under § 360cc(a), which is entitled to some weight.  FDA's Mot. at 13.  It says that it has "long construed the [ODA] to tie exclusivity to the particular use or indication for which the orphan drug is approved." *Id*. at

7 (citing Orphan Drug Regulations, 56 Fed. Reg. 3338, 3339 (Jan. 29, 1991)).  The court does not

disagree.  The FDA has read § 360cc(a) that way since at least 1991.  *See supra* Section II.A.  It is

true that "longstanding practice of the government . . . can inform a court's interpretation of what

the law is."  *Loper Bright*, 603 U.S. at 386 (cleaned up).  Such practice, however, is only an

"interpretive aid," and it cannot "supersede" the "judgment of the Judiciary."  *Id.*  Here, the court's

judgment is that the "single, best meaning" of § 360cc(a) is contrary to how the FDA has read it

for decades.  *Id.* at 400.  "Even an agency's consistent and longstanding interpretation, if contrary

to statute, can be overruled."  *Carlson v. Postal Regulatory Comm'n*, 938 F.3d 337, 349 (D.C. Cir.

2019).

        Finally, Defendants suggest that "Congressional action provides further support for [their]

interpretation."  FDA's Mot. at 21–22; *see also* Aquestive's Mot. at 24–25.  They point out that

"Congress has amended § 360cc(a) without disturbing or otherwise casting doubt on FDA's

construction."  FDA's Mot. at 21; *see also* Aquestive's Mot. at 24 ("Congress never once cast

doubt on FDA's consistently maintained position that ODE's scope necessarily is defined by the

NDA's approved uses and indications—let alone abrogated that interpretation.") (citations

omitted).  Specifically, the FDA points to "technical changes" to § 360cc(a) in 1997 and 2002, and

in 2017 Congress made a "significant change to § 360cc(a) but did not purport to upset FDA's

interpretation regarding the scope of exclusivity."  FDA's Mot. at 21; *see Jazz Pharms.*, 2024 WL

4625731, at *6–7 (discussing 2017 amendments to § 360cc).  Defendants add that, during these

amendments to the statute, Congress was aware of the FDA's indication-focused interpretation of

the ODA.  FDA's Reply at 14–15; Aquestive's Reply at 10–11.

        Although neither Defendant expressly says so, what they argue in essence is that, by its

silence, Congress has acquiesced to the FDA's reading of § 360cc(a).  Although the Supreme Court

has "recognized congressional acquiescence to administrative interpretations of a statute in some situations, [it has] done so with extreme care." *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 169 (2001).  Absent "overwhelming evidence," the Court has been "loath to replace the plain text and original understanding of a statute with an amended agency interpretation." *Id.* at 169 n.5.  When the law's text is plain, "subsequent reenactment does not constitute an adoption of a previous administrative construction." *Brown v. Gardner*, 513 U.S. 115, 121 (1994) (internal citations and quotation marks omitted).

Controlling authorities illustrate what constitutes "overwhelming" evidence of congressional acquiescence.  In *Solid Waste*, for example, the Court cited *Bob Jones University v. United States*, 461 U.S. 574 (1983), as an example of congressional acquiescence where the agency's interpretation of the statute was the "correct" one.  *Solid Waste*, 531 U.S. at 169 n.5 (quoting *Bob Jones Univ.*, 461 U.S. at 595).  In that case, Congress had held multiple hearings on the issue, which made clear that "any Member of Congress" was "abundantly aware of what was going on." *Id.*  The Court also noted that no fewer than 13 bills in 12 years had been introduced to try to overturn the agency's interpretation and all had failed.  *Id.*  More recently, in *Washington Alliance of Technology Workers v. Department of Homeland Security*, the D.C. Circuit found that "evidence of congressional acquiescence abound[ed]" in a case involving a decades-old practice concerning a student visa category, where agency officials testified before Congress numerous times about this practice and Congress repeatedly amended the relevant provisions, yet left the statutory text undisturbed.  50 F.4th 164, 182–83 (D.C. Cir. 2022).  Also, in *Farhy v. Commissioner of Internal Revenue*, the D.C. Circuit found as evidence supporting its statutory construction "forty years of congressional acquiescence" to the Internal Revenue Service's practice of assessing and

collecting certain statutory penalties, which included seven amendments of the statute, each of which "left undisturbed" the IRS's practice. 100 F.4th 223, 236 (D.C. Cir. 2024).

The evidence of congressional acquiescence in this case pales in comparison. The FDA cites a mere three legislative changes to § 360cc(a) in the over 40 years since the ODA's original enactment. Two of these it describes as "technical." FDA's Mot. at 21. The only substantive change came in 2017, and that amendment had nothing to do with the FDA's indication-centered understanding of that provision. It came in response to a judicial decision from this District Court that called into question an altogether different issue under § 360cc(a). *See Eagle Pharms.,* 952 F.3d at 329 n.9 (observing that, in 2017, "Congress amended the ODA to codify a clinical superiority requirement for exclusivity and supersede" the holding in *Depomed, Inc. v. HHS*, 66 F. Supp. 3d 217 (D.D.C. 2014)); *Jazz Pharms*., 2024 WL 4625731 at *6–7 (describing the 2017 amendments enacted after *Depomed*). This sparse legislative history is far from the type of "regular[] amend[ment]" of the Immigration and Nationality Act that the court in *Washington Alliance* viewed as strong evidence of congressional acquiescence, 50 F.4th at 183, or even the seven legislative enactments to the Internal Revenue Code provision at issue in *Farhy*, 100 F.4th at 236.

Beyond actual statutory changes, Aquestive says there is "ample evidence that Congress was well aware of FDA's indication-based interpretation of ODE." Aquestive's Reply at 10–11. The "ample evidence" consists of one Senate Committee report from 2001, one Congressional Research Service report from 2017, and a Government Accountability Office report from 2018. *Id.* Three reports over 17 years is hardly the quantity of evidence that would allow the court to draw the conclusion that Congress was "abundantly aware of what was going on." *Bob Jones*

*Univ.*, 461 U.S. at 600–01 (finding such knowledge where Congress had introduced and failed to pass 13 bills in 12 years to overturn the IRS's interpretation of a code provision).

Nor is there a long history of actual agency practice from which the court can make a finding of congressional acquiescence. "By the FDA's own admission," its decision in *Catalyst* "was likely the first time it ever 'approved an application for a drug with an indication to treat pediatric patients for a certain disease while another sponsor has obtained orphan drug exclusivity for a drug application for the same drug with only an indication to treat adult patients for that disease.'" *Catalyst Pharms.*, 14 F.4th at 1305 (quoting FDA brief). This case appears to be the second. That is a far cry from the "longstanding practice [that] was no secret to Congress" in *Washington Alliance*, 50 F.4th at 182, or the IRS's 60-year "undisturbed" practice of assessing and administratively collecting a statutory penalty in *Farhy*, 100 F.4th at 236.

In short, on this record, the court cannot find that congressional action—or inaction—supports Defendants' reading of § 360cc(a).

### 2. *Precedent Does Not Support Defendants' Reading*

Turning then to caselaw, the FDA asserts that two appellate court decisions buttress their understanding of § 360cc(a). FDA's Mot. at 16–18. They point first to the D.C. Circuit's decision in *Spectrum Pharmaceuticals, Inc. v. Burwell*, which involved the question of whether intended off-label[7] uses mattered for the purposes of § 360cc(a)'s exclusivity provision. 824 F.3d 1062, 1064–65 (D.C. Cir. 2016). They also rely on *Sigma–Tau Pharmaceuticals, Inc. v. Schwetz*, which involved very similar facts and issues. 288 F.3d 141 (4th Cir. 2002). In both cases, the courts addressed the question of whether the FDA was barred from approving a drug that might be prescribed off-label for a use that was protected by an approved drug's exclusivity. *Spectrum*

---

[7] While drug manufacturers may only promote drugs for uses that are approved by the FDA, physicians may "exercise their professional judgment to prescribe legally marketed drugs for unapproved uses." FDA's Mot. at 17 n.2.

*Pharms.*, 824 F.3d at 1067; *Sigma-Tau,* 288 F.3d at 144.  The courts concluded that a comparison of the drugs' approved uses was all that the ODA required, because the statutory language "focuses on protecting *approved indications*, not intended off-label uses."  *Spectrum Pharms.*, 824 F.3d at 1067 (citing *Sigma-Tau*, 288 F.3d at 145) (emphasis added).  Although acknowledging that these cases involved "different facts," the FDA argues that both cases stand for an "interpretative approach to § 360cc(a)" wherein "the operation of the exclusivity provision" is "informed by the concept of approved uses or indications" contained in the application.  FDA's Mot. at 16.  In its view, "both [cases] take due account of § 360cc(a)'s cross references to, and relationship with § 355's application and approval process."  *Id.* at 17–18.

But there is no daylight between the courts' approaches in *Spectrum* and *Sigma-Tau* and this court's reading of § 360cc(a).  As in those cases, the question here of whether Valtoco's exclusivity blocked Libervant's approval turns on the respective drug applications submitted under § 355.  The key question is what application components does § 360cc(a) require the FDA to compare when deciding whether it can approve a second drug.  The statutory text provides a straightforward answer.  The FDA must ask whether the approved NDA and the later-submitted NDA involve (1) the "same drug" and (2) "for the same disease or condition."  21 U.S.C. § 360cc(a).  If the second drug is the "same" as to both criteria, the FDA cannot approve it until the earlier drug's exclusivity expires; on the other hand, if the second drug is not the "same" on either criterion, exclusivity poses no barrier to approval.  Congress did not deem any other component of the NDA—including the drug's "use or indication" or any intended off-label uses— relevant to making that comparison under § 360cc(a).

3.    *Defendants' Policy Rationales Do Not Override the Plain Statutory Text*

Finally, Defendants make what they call various "structur[al]" arguments, which are really dressed-up policy rationales.  FDA's Mot. at 19.  Their concern centers on how Neurelis's reading, if accepted, would skew market incentives for drug manufacturers and the potential adverse impacts on patient populations.

Defendants point to the fact that the designation-to-approval process is often iterative. Designation predates approval by years or decades, when there is "insufficient information to determine the uses or indications for which the drug will eventually be approved."  FDA's Mot. at 19, 20; s*ee also* Aquestive's Mot. at 29–30.  Thus, at the designation stage, the "FDA generally makes broad designations."  FDA's Mot. at 20.  Then, at the approval stage, if a manufacturer "fails to obtain approval for the entire disease or condition, exclusivity is correspondingly limited to the segment of the population or disease[8] for which approval was granted."  *Id.*  Given this reality, Defendants fear that Neurelis's reading of § 360cc(a) would "incentivize the manufacturer of an orphan-designated drug to race towards approval for the narrowest use for which it can marshal support."  *Id.* at 1–2.  Once exclusivity is secured based on a narrow use, the manufacturer could "block others from obtaining approval for any other use of the same drug" to treat the same disease or condition.  *Id.* at 2.  The downstream consequence would be that drug manufacturers, like Aquestive, would be disincentivized from developing drugs for unapproved uses.  So, for example, if the FDA were to approve a first-time orphan drug for use in only a small patient population, other pharmaceutical companies would have reduced incentives to develop that same drug for other subpopulations, if they could not secure agency approval for seven years.  The

---

[8] Beyond approvals limited to a patient subpopulation, an approval may also be limited to a certain segment of a disease, *e.g.*, Stage 1 versus Stage 4 ovarian cancer.  *See* FDA's Mot. at 19.

ultimate effect could be that patients will be denied access to drugs that could be approved to treat their disease. *Id.* at 25.[9]

The court is unpersuaded. The FDA has not shown that, since *Catalyst*, drug manufacturers have raced to secure the "narrowest use" to block competitors from serving other populations. Nor is that result intuitive. While a grant of exclusivity is valuable, such a grant does not allow companies to market their drugs other than for the "approved uses or indications." FDA's Mot. at 6 (citing relevant statutes). For example, a drug approved only for pediatric use cannot be marketed for treatment in adults. Drug companies therefore arguably are incentivized to seek as broad an exclusive approval as they can from the start, so that they can lawfully market their product to treat the greatest number of patients. True, a company that secures exclusive approval for a drug only for a narrow subpopulation may be able to broaden its use through approval of a supplemental application during the exclusivity period. But there is no guarantee that such an approval will receive marketing exclusivity, absent a showing of clinical superiority. *See* 21 U.S.C. § 360cc(c). Thus, racing to secure approval for only a narrow use is not likely to be a financially sound approach. The facts of this case make that point. Neurelis did not attempt to secure approval for Libervant for a narrow population from the start and then move for broader approval. It did the opposite. It obtained broad approval for use in patients ages six and above and, during its exclusivity period, it sought approval for the small, under-six pediatric population. For Neurelis to have tried to secure approval in the reverse order would have made little economic sense.

---

[9] The parties contest whether Congress contemplated that the practice of off-label prescribing would fill the gap. *Compare* Pl.'s Combined Mem. in Opp'n to Defs.' Mots. & Reply in Support of Pl.'s Mot., ECF No. 34-1, at 21 (asserting that "FDA and Aquestive's arguments presume that Congress legislated under the misimpression that off-label use is disfavored or prohibited rather than ubiquitous and essential to patient care"), *with* Aquestive's Reply at 8 ("If Congress in fact shared Neurelis's full-throated embrace of off-label use, then why did it bother to require FDA to approve new drugs in the first instance, *see* 21 U.S.C. § 355(a)?"). The court does not need to resolve this debate in light of the clear statutory text.

In any event, Defendants' policy concerns cannot overcome the statute's plain text. The D.C. Circuit confronted a similar policy-based argument as to the interpretation of § 360cc(a) in *Eagle Pharmaceuticals*, and it responded that, "[i]n light of an unambiguous statutory directive, it is not [the court's] place to second-guess how the Congress chose to effectuate the policy goals underlying the statute as a whole." *Eagle Pharms.*, 952 F.3d at 336. That observation applies with equal force here. It is the role of this court "to apply the statute as it is written—even if" it thinks "some other approach might accord with good policy." *Burrage v. United States*, 571 U.S. 204, 218 (2014) (cleaned up). If Defendants believe that their reading of the ODA makes for better policy, it is for Congress, not this court, to amend the statute.[10]

## V.    CONCLUSION

For the foregoing reasons, the court grants Neurelis's Motion for Summary Judgment, ECF No. 24, and denies Defendants' Cross-Motions for Summary Judgment, ECF Nos. 28, 30. The court therefore vacates the FDA's approval of Aquestive's drug product Libervant.

Further, because the court enters a final judgment in favor of Neurelis, its Motion for an Expedited Preliminary Injunction, ECF No. 48, and Aquestive's Motion to Strike the Supplemental

---

[10] The 118th Congress considered revising § 360cc(a) post-*Catalyst* to align with Defendants' reading. Under the RARE Act, among other changes, § 360cc(a) would be amended to replace the term "same rare disease or condition" with "same approved use or indication for which such 7-year period apples to such already approved or licensed drug." *See* RARE Act, S. 1214, § 2(a)(2)(A) (118th Cong.) (introduced Apr. 19, 2023) (*available at* https://www.congress.gov/bill/118th-congress/senate-bill/1214/text (last visited Feb. 14, 2025)). The Senate Committee on Health, Education, Labor, and Pensions reported out the bill favorably, but it did not proceed to a floor vote. *See* Congress.gov, S.1214 - RARE Act, *available at* https://www.congress.gov/bill/118th-congress/senate-bill/1214/all-actions (last visited Feb. 14, 2025). The RARE Act also was introduced in the House of Representatives but did not proceed out of committee. *See* RARE Act, H.R. 7383 (118th Cong.) (introduced Feb. 15, 2024) (*available at* https://www.congress.gov/bill/118th-congress/house-bill/7383/text (last visited Feb. 14, 2025)); Congress.gov, H.R. 7383 - Rare Act, *available at* https://www.congress.gov/bill/118th-congress/house-bill/7383/all-actions (last visited Feb. 14, 2025). The court draws no interpretative meaning from the non-passage of this proposed legislation.

Declaration of Craig Chambliss, ECF No. 58, are denied as moot.  Neurelis's Motion for Leave to File Sealed Supplemental Declaration, ECF No. 57, is granted.

A final, appealable order accompanies this Memorandum Opinion.

Dated:  February 14, 2025

_____
Amit P. Mehta
United States District Court Judge